### In re Dorothy Chase STEWART, Debtor.

### No. 07–11113.

United States Bankruptcy Court, E.D. Louisiana.

April 10, 2008.

Elisabeth D. Harrington, Kirk L. Myers, Harrington & Myers, Metairie, LA, for Debtor.

## MEMORANDUM OPINION

ELIZABETH W. MAGNER,
Bankruptcy Judge.

On August 23, 2007, Debtor, Dorothy Chase Stewart ("Debtor"), filed an Objection to Wells Fargo Home Mortgage, Inc., as agent to Lehman Brothers' ("Wells Fargo") second amended claim. The proof of claim was signed by Hilary Bonial ("Bonial") of Brice, Vander Linden & Wernick, P.C. ("Brice"), national counsel to Wells Fargo. Debtor objected to the amounts claimed, demanded a payment history and support for items included in the claim described as "Other Amounts for Inspection Fees, Appraisal Fees, NSF Check Charges, and Other Charges" as well as "Pre–Petition Attorney [sic] Fees and Costs" and "Escrow Advance."

Wells Fargo filed a timely Response to the Objection ("Response") further itemizing the amounts included in the line item categories to its proof of claim. Wells Fargo listed the individual taxes and insurance payments made from Debtor's escrow account by amount and date of payment. It also attached copies of the invoices which it alleged substantiated its claim for prepetition attorneys' fees and costs. It identified property inspections, appraisal fees, title research fees, and property preservation fees as the other charges owed. These charges were itemized by type, but Wells Fargo did not supply any additional

information as to the amount, date, or payee for each charge, nor did it supply copies of invoices or proof of payment for the other charges claimed.

Wells Fargo's Response also admitted that the negative escrow balance contained in its proof of claim was still under review. Specifically, Wells Fargo was not able to ascertain if the amounts claimed for escrow included a credit for the portions of the past due monthly installments attributable to escrow. Without this information, or a full history of the escrow account, Wells Fargo admitted that Debtor would not be able to verify the amounts it claimed on its proof of claim, and conversely, Wells Fargo would not be able to prove the amounts owed.

The Response was signed by Hershel C. Adcock, Jr., as local counsel to Wells Fargo. Approximately one week later, the Response was supplemented to provide a credit against the escrow account for a property tax deduction that was not owed.[1] The Response also detailed the individual past due monthly installments by date, principal, interest, and escrow portions. A schedule reflecting amounts paid into and deducted from escrow over the life of the loan was also supplied.

The initial hearing on this matter was held on September 25, 2007. Paul Rummage of the Law Offices of Paul Rummage and Herman Wessels of Dean Morris, LLP, appeared on behalf of Wells Fargo. Counsel were the third and fourth law firms to represent Wells Fargo since the inception of the case. Neither Ms. Bonial nor Mr. Adcock appeared. As of the initial hearing date, Wells Fargo still had not supplied a full loan history nor had it produced any documentation to substantiate the amounts it claimed for fees and costs, save the invoices of foreclosure counsel. At the start of the hearing, it was evident that counsel were uninformed as to the nature or amounts due on the claims filed, with one limited exception.

Herman Wessels of Dean Morris represented that after reviewing the invoices his firm had submitted to Wells Fargo in connection with the foreclosure and eviction proceedings against Debtor, errors in billing became evident. Specifically, the invoices contained a charge for a deposit forwarded to the sheriff in connection with an eviction action. When the eviction suit was dismissed, the deposit was returned to Dean Morris, and $1,800.00 should have been refunded to Wells Fargo and credited toward Debtor's account. Upon further questioning, it was also admitted by Dean Morris that a deposit might also exist in connection with the foreclosure action, but further research was necessary.

The Court continued the hearing to November 1, 2007, ordered the appearance of Ms. Bonial and Mr. Adcock at the continued hearing date, and ordered production no later than October 25, 2007, of a loan history and copies of all invoices, cancelled checks, and other evidence to support the costs, fees, and charges claimed.

On October 24, 2007, Wells Fargo filed a request for an extension of the deadline to produce the documentation and accounting. The request for extension was considered at the hearing on November 1, 2007, during which the Debtor painstakingly identified the additional information needed, or explanations required, to review the accounting Wells Fargo supplied. Wells Fargo was instructed to bring to the next hearing a representative with personal knowledge of this loan as well as Wells Fargo's administrative policies. It was also ordered to provide documentation from the sheriff regarding the amounts

---

1. Debtor's home is exempt from property taxes.

charged in connection with the foreclosure. Wells Fargo committed to verify the amounts claimed in connection with the escrow account and to reconcile the amounts claimed on proofs of claim filed in previous cases against its loan history. The Court also ordered the production of any notices delivered to Debtor regarding 1) changes in her adjustable interest rate or escrow account; or 2) the imposition of fees, costs, or charges against her account.

At the second continued hearing on December 4, 2007, Hilary Bonial and Paul Rumage appeared on behalf of Wells Fargo with Kimberly Miller, Vice President in charge of Bankruptcy, Foreclosure, and the Litigation Management Department ("Bankruptcy Dept.").

### *Jurisdiction*

This Court has jurisdiction pursuant to 11 U.S.C. §§ 501 and 502 and Fed. R. Bankr.P 3001, 3002, and 3007; this is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### *Facts*

Debtor, along with her now deceased husband William Chase, Jr., obtained a loan from Norwest Mortgage, Inc., in 1999. The loan is secured by a mortgage on her home and the debt is currently being serviced by Wells Fargo, as agent for Lehman Brothers, the assignee of Norwest Mortgage, Inc.

The current bankruptcy was filed on June 12, 2007; it is the third bankruptcy filed by the Debtor or her deceased husband. The first bankruptcy was filed by William Chase, Jr.,[2] on January 11, 2002, and dismissed on January 29, 2004, for failure to make payments to the trustee. The second bankruptcy was filed *pro se* on April 20, 2004, and dismissed on July 26,

2005, for failure to make payments to the trustee. In this case, Debtor is represented by counsel.

Wells Fargo has filed three proofs of claim in this case. The first, filed on July 12, 2007, listed $33,641.80 in past due sums accruing prepetition. On August 20, 2007, Wells Fargo amended its original claim to add two additional past due monthly installments for July and August 2007. Technically, these installments accrued postpetition and should not have been added to the prepetition amounts itemized by Wells Fargo.

Wells Fargo itemized its past due balance:

*Total Arrearage as of August 31, 2007*

| | |
|---|---|
| ●Regular Monthly Installments July 1, 2004, through August 31, 2007 | $26,582.67 |
| ●Late Charges | 776.44 |
| ●Pre-petition Attorney Fees and Costs | 6,663.96 |
| ●Other pre-petition fees, expenses and charges as reflected in 1A above | 1,013.75 |
| ●Interest accruing at the contract rate of 10.38% on pre-petition arrearage if allowed by 11 U.S.C. § 1322(e) | (0.00) |
| | $35,036.82 |

The proofs of claim were all signed by Bonial as Wells Fargo's authorized agent. They all bear the following assertion:

> Please be advised that reasonable fees and costs for the review of the bankruptcy pleadings, review of client information, preparation and filing of the Proof of Claim will be charged to the lender/servicer for post-petition services rendered subsequent to the filing of this bankruptcy matter. Further, note that future fees and costs for bankruptcy related services are expected to accrue throughout the life of this bankruptcy case, and will be charged to the lender/servicer. If such fees and costs or charges are not paid through the bank-

---

**2.** Although William Chase, Jr., filed the first bankruptcy individually, in an attempt to reduce confusion, the Court will often refer to

the Debtor when discussing the details of that bankruptcy.

ruptcy, the lender reserves the right, at the lender's discretion, to seek future reimbursement for the fees, costs and charges related to services rendered and expenses incurred pursuant to the terms provided for in the underlying security instrument, the bankruptcy code and other applicable law.[3]

*Loan Documents*

Debtor's note requires monthly payments of principal and interest sufficient to amortize her original principal balance of $61,200.00 over 30 years ("Note").[4] During the first three (3) years of the Note, the interest rate was 10.375% per annum. On the third anniversary of the Note's execution, and every year thereafter, the interest rate is subject to adjustment by adding 7% to the average weekly yield on United States Treasury Securities adjusted to a constant security of one year. Monthly payments are due on the first day of the month and considered late after the fifteenth day.

If full payment of principal and interest is not received on time, the Note provides that the holder may assess a late charge equal to 5% of the past due principal or interest outstanding. The Note states that only one late charge may be assessed on each late payment.[5]

The Note is secured by the mortgage encumbering Debtor's home ("Mortgage"). Both the Note and Mortgage allow, as a reimbursable expense, up to 25% of the sums due as attorney's fees.[6]

The lender did not initially establish an escrow account for the payment of insurance premiums and property taxes incurred in connection with the property securing this loan. Debtor is elderly and the assessed value of her home is exempt from property taxes due to the homestead exemption and her age. Insurance was initially acquired and paid for by Debtor outside of the loan. The Mortgage provides that if the lender advances money for the payment of insurance premiums or property taxes on behalf of the borrower, then those amounts are immediately reimbursable, or at the lender's sole discretion, may be repaid in twelve monthly installments.[7]

The Mortgage also authorizes lender's collection, on a monthly basis, of the amounts it reasonably estimates will be necessary to satisfy future property tax or insurance premium demands. It allows the lender to assess and hold the maximum sum provided by 12 U.S.C. § 2603, *et seq.* ("RESPA").[8]

The Mortgage allows Wells Fargo to make reasonable entries upon and inspections of the property. However, the Mortgage also provides that Wells Fargo "*shall* give Borrower notice at the time of or prior to an inspection specifying *reasonable* cause for the inspection."[9] Finally, the Mortgage requires that "[a]ny notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another

---

3. This language was further amended on September 9, 2007.

4. Exh. C. Note.

5. Exh. C, Note ¶ 7(A).

6. Exh. C, Note ¶ 7(E); Mortgage, ¶ 21.

7. Exh. C, Mortgage ¶ 2.

8. Exh. C, Mortgage ¶ 2. The provisions set forth in 12 U.S.C. § 2603, *et. seq.*, are also known as the Real Estate Settlement Procedures Act, or RESPA.

9. Exh. C, Mortgage ¶ 9, emphasis added.

method." [10]

The Mortgage also provides that if Debtor fails to perform under the terms of the loan documents, Wells Fargo may:

> ... do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include ... paying reasonable attorney's fees ... Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, *upon notice* from Lender to Borrower requesting payment.[11]

The order of application of payments collected under the Note is set forth in the Mortgage. The Mortgage provides that payments will be applied to: 1) prepayment charges; 2) funds necessary to satisfy property taxes or insurance premiums; 3) accrued interest; 4) accrued principal; and finally, 5) late charges.[12] The Note does not address how attorneys fees, costs, or fees other than late fees, property taxes, or insurance charges are to be satisfied.

Specific provisions control over the general terms of an agreement.[13] Because the Mortgage specifically requires that any payment received must first be applied to satisfy outstanding escrow charges, accrued interest, accrued principal and late charges, in that order, the Court finds that these obligations must be satisfied prior to the satisfaction of any additional sums incurred in connection with protecting the property or enforcing the terms of the Note.

The Note and Mortgage are governed by Louisiana law, which provides that attorney's fees and charges may be contractually authorized, but even if contractually allowed their assessment must be reasonable.[14]

Based on the law and analysis set forth below, the Court has applied the payments received on this debt and in accordance with the terms of the Note and Mortgage. It has also allowed or disallowed various charges, costs, or fees based on the terms of the Note and Mortgage; the accounting, testimony, and documentation supplied by Wells Fargo; Louisiana Law; and RESPA. The new loan history is reflected as Table I, attached to this Memorandum Opinion. The payments, costs, fees, and charges reflected on Table I are incorporated into this Memorandum Opinion as findings of fact.

### Law and Analysis

 In this case, Debtor claims Wells Fargo abused its discretion when it imposed the fees, costs, and charges against her account. It, therefore, becomes necessary to examine what, when, how and why any particular charge, fee, or cost is assessed. In order to evaluate Debtor's claims, some background regarding the ad-

---

10. Exh. C, Mortgage ¶ 14.

11. Exh. C, Mortgage ¶ 7, emphasis added.

12. Exh. C, Mortgage ¶ 3.

13. *See, e.g., Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 314 n. 17 (5th Cir.1988); *Carpenters Amended and Restated Health Ben. Fund v. Holleman Const. Co. Inc.,*

751 F.2d 763, 766 (5th Cir.1985); *Weingarten Realty Investors v. Albertson's Inc.,* 66 F.Supp.2d 825, 839 (S.D.Tex.1999).

14. *See, Central Progressive Bank v. Bradley,* 502 So.2d 1017 (La.1987); *Wuertz v. Tobias,* 512 So.2d 1209 (La.App. 5th Cir.1987); and *City of Baton Rouge v. Stauffer Chemical Company,* 500 So.2d 397 (La.1987).

ministrative practices of Wells Fargo is necessary.[15]

*Loan Administration*

Ms. Miller explained that Wells Fargo administers 7.7 million home mortgage loans.[16] The management or administration of these loans is accomplished through several computer software packages, some owned by Wells Fargo, some licensed from third party vendors. Entries on the loan account are tracked with a licensed computer software platform commonly known as Fidelity Mortgage Servicing Package or Fidelity MSP. Fidelity MSP provides extremely sophisticated computer software for the management of home mortgage loans and is one of the largest providers of this service nationally. When a payment is received on a mortgage loan, it is entered into the Fidelity MSP system and then deposited. Fidelity MSP applies the payment to a borrower's account; in this case, satisfying outstanding fees and costs first.

In this Court's experience, virtually every home mortgage executed in the United States contains provisions that determine when payments are due, when they are considered late, what fees or charges may accrue if late, when a default can be declared, the remedies available on default, and which collection fees or charges are recoverable after default. In addition, most notes and mortgages provide fairly clear directives regarding the application of payments between principal, accrued interest, fees, costs, and amounts due to satisfy insurance and property taxes. Mercifully, most home mortgage loans have relatively standard, predictable language. However, the right to assess certain charges or fees on late payment or default is often at the discretion of the holder of the note. How this discretion is exercised is subject to guidelines not contained in the note or mortgage.

In this Court's opinion, the exercise of that discretion may be impacted by the relationship between the holder of the note and the party that administers its collection. In the present financial market, almost every home mortgage loan is packaged with thousands of other loans and sold to investors assembled on Wall Street. The securitization of mortgage loans allows the original lender to immediately recover the amounts lent, providing it with liquidity and reducing its risk of default. The investors that acquire these bundled loans or portfolios are most often not banks or credit unions, the traditional members of the lending community. Instead, they are investment or brokerage houses; insurance companies; hedge, pension, or mutual funds; and other investment groups. They then hire a loan service provider to administer the loan portfolio.

The securitization of home mortgage loans has divorced the lending community from borrowers. Not only are the new holders of the mortgage notes nontraditional lenders, but a mortgage service pro-

---

**15.** A properly filed proof of claim constitutes *prima facie* evidence of the claim's validity and amount. An objecting party must present sufficient evidence to overcome the *prima facie* effect of the claim. If the objecting party succeeds, the creditor must prove the validity of the claim. *See, Matter of O'Connor,* 153 F.3d 258, 260 (5th Cir.1998) and Bankruptcy Rule 3001. Wells Fargo admitted at the September 25, 2007, hearing that there were errors in its proof of claim. In addition, the Court finds that inconsistencies between the proof of claim filed by Wells Fargo and its accounting substantiate this admission. The Court finds that this admission is sufficient to rebut the *prima facie* presumption and shift the burden to Wells Fargo.

**16.** *See,* December 4, 2007, Tr. T. 18:14–147:13 for Ms. Miller's description of Wells Fargo's procedures.

vider is a buffer in the relationship between lender and borrower. The holders of notes do not see themselves as lenders, but investors in an asset. They have little interest in the relationship between lender and borrower except as it might affect their return on investment.

Mortgage service providers administer notes for a fee. The terms of their agreements with investors, as well as the guidelines the investors set for administration of the loan, have ramifications for the borrower. Most servicing agreements allow the service provider to charge a flat fee, usually stated as a percentage of the portfolio under administration. All principal and interest payments collected are paid to the note holder. Usually, fees are additional income to the service provider while costs are simply a pass through, or reimbursable items. In addition, servicers invest the "float," or funds held on deposit, and retain earnings on that investment. Therefore, amounts held in escrow or in debtor suspense are an addition source of revenue for the servicer. While a mortgage service provider and note holder's interests are closely aligned, they are not perfectly aligned. It is in a mortgage service provider's interest to collect fees and hold funds, both of which generate additional income for its account. Conversely, a note holder or investor is interested in the collection and application of payments to principal and interest.

Since many fees and charges are imposed at the discretion of the lender and must be "reasonable" under the law, servicing agreements may establish guidelines for the exercise of that discretion.[17] In this case, Wells Fargo did not produce its servicing agreement. Therefore, the exact terms of its relationship with Lehman

Brothers and the financial incentives available to Wells Fargo are not in evidence.

In any event, Ms. Miller testified that once the guidelines for management of a loan are determined by the loan's investor, Fidelity MSP imports the guidelines into its internal logic.[18] For example, if investor guidelines suggest the assessment of a late charge every time a payment is fifteen (15) days past due, the Fidelity MSP system will automatically assess a late charge if payment is not posted to the account within fifteen (15) days of its due date.

Other charges or fees are assessed against the account by virtue of "wrap around" software packages maintained by Wells Fargo. These software packages interface with Fidelity MSP and implement decisions based on their own internal logic. For example, if a borrower is delinquent in making a payment, Wells Fargo's computer system may automatically send a demand letter to the borrower. Guidelines might also recommend a property inspection if a loan is past due. If such an event occurs, the computer system will automatically generate a work order for an inspection, allow the vendor to upload the completed report, generate a check to the vendor for the inspection, and charge the customer's account—all without human intervention.

When a loan is involved in foreclosure, bankruptcy, or other litigation, Wells Fargo manages that loan through its Bankruptcy Department located in Fort Mill, South Carolina. Ms. Miller is the Vice President who oversees this department of 375 people.

The transfer of loans involved in a bankruptcy to Ms. Miller's department begins with America InfoSource ("AIS"), a third

---

**17.** In many cases the service agreements will simply refer to a published set of guidelines used by federal agencies.

**18.** *See, supra,* note 16.

party vendor hired by Wells Fargo to provide daily information regarding new bankruptcy filings that may potentially involve Wells Fargo loans. At the inception of this relationship, Wells Fargo supplied AIS with a listing of every credit relationship it held or serviced, as well as certain fields of information (debtor's name, address, social security number, etc.) on each borrower. The information is updated daily as Wells Fargo acquires new relationships and old ones are closed.

AIS scans the electronic databases of all the bankruptcy courts in the country and attempts to match debtors to any of the information supplied by Wells Fargo. If a match is made for one field of information, Wells Fargo is immediately notified. The notification provides Wells Fargo with the debtor's name, address, social security number, the bankruptcy court, case number, chapter type, and judge assigned. Once notified, Wells Fargo verifies that the debtor is a borrower. To verify the "match," Wells Fargo scans the information supplied by AIS against its own records. Ideally, three fields or pieces of information will be verified and matched.[19] If a three field match is not secured by Wells Fargo's internal computer system, the system will reject the borrower and a manual match will be attempted. This is one of the few times any human being touches or reviews a loan's electronic record.

Once Wells Fargo's computers have verified the AIS borrower match, the program automatically activates a system within the Fidelity MSP software platform called a Bankruptcy Work Station ("BWS"). This sub-part of Fidelity MSP is allegedly infused with computer logic designed to manage a loan during a pending bankruptcy. The supervision of that loan then falls to Ms. Miller.

Once a borrower's status as a bankruptcy debtor has been confirmed, the Fidelity MSP/BWS automatically advises counsel for Wells Fargo when a loan is referred for legal action. Who is selected to represent Well Fargo is dependent on who owns the loan. If a loan is owned by Wells Fargo, it is automatically referred to one of its national counsel; either Brice or McCalla Raymer. If held by one of the federal agencies, Wells Fargo will refer the loan to a firm on an approved list supplied by the agency. If held by a private investment group, that group can specify counsel or can delegate the responsibility to Wells Fargo as the service provider. If the loan is managed by national counsel, local counsel are retained to physically file pleadings and make court appearances when necessary. Local counsel are not given access to either the electronic files or accounting history but receive all of their information from national counsel. They typically do not have direct client access and may even be prohibited from contacting the service provider or note holder by their retainer agreements.[20]

---

**19.** Wells Fargo's computer system for this function is called Hogan. Hogan will typically attempt to match the customer's name, address and social security number. If this does not result in a complete three field match, other file information may be used.

**20.** *See, In re Parsley,* 384 B.R. 138 (Bankr. S.D.Tex.2008). Although the *Parsley* opinion involved Countrywide, it contains an excellent explanation of the typical relationship between national counsel and local firms with

regard to their representation of parties in this industry. In this Court's experience, the relationships and practices are similar from service provider to service provider, note holder to note holder. Wells Fargo's testimony substantiates this belief.

This Court has already remarked on the obvious problems with this system. Local counsel are rarely prepared to answer specific questions about the information contained in a proof of claim or a motion for relief from

Once the BWS notifies Brice that it has been retained, Brice is given immediate access to Wells Fargo's mainframe computer platform. In addition, the computer automatically searches different parts of Wells Fargo's multiple software packages and compiles a storage file where counsel can obtain all the information necessary to perform his or her duties. For example, when a loan is owned or serviced by Wells Fargo, the documents evidencing the initial loan transaction are kept in pdf format under a software platform called FileNet. FileNet is scanned for copies of the note, mortgage, recordation certificate, and other relevant closing documents. Those electronic files are then assembled in a storage file for counsel's use. The Fidelity MSP system, containing the loan's account history, is open to review by counsel. iClear, another computer program, contains copies of the invoices that represent costs billed to the loan.[21]

The first task of counsel, once a bankruptcy is filed, is to prepare a proof of claim. Because counsel has direct access to Wells Fargo's complete loan accounting, as well as the documents that support its debt and security interest, national counsel prepares the proof of claim without ever speaking to a Wells Fargo representative. In fact, Wells Fargo testified that it does not review any proof of claim prior to its filing. Wells Fargo's testimony was that *only after filing* was the proof of claim reviewed for accuracy.[22] Other legal assignments are executed in a similar fashion.

For example, when a loan goes into postpetition default, the BWS automatically notifies legal counsel of this fact. Legal counsel then prepares a motion for relief utilizing information obtained from the Fidelity MSP system and BWS, including attaching any necessary documents to sup-

---

the automatic stay. They do not have access to either a loan history or the documents necessary to substantiate any charge or discrepancy. Typically they assume the role of dutiful scribes, taking notes on the Court or Debtor's questions and promising to deliver documents or answers at the next hearing. This practice is both wasteful and inefficient. It also does not comport with the Canons of Ethics or the Local Rules of the District Court. *See, generally,* Bankruptcy Rule 9011, E.D. La. Loc. R. 11, Louisiana State Bar Assc. Rules of Professional Conduct, Art. 16, Rules 1.3, 5.1, 5.4, and 5.5; *see also, In re Porcheddu,* 338 B.R. 729 (Bankr.S.D.Tex.2006); *In re Ulmer,* 363 B.R. 777 (Bankr.D.S.C.2007); *In re Osborne,* 375 B.R. 216 (Bankr.M.D.La. 2007); and *In re Parsley, supra.*

Four different firms have appeared for Wells Fargo in this case alone. Only Brice, Wells Fargo's national counsel, appears to have the information or access necessary to address the issues presented in this case. It is worth noting that despite Debtor's Objection to the proof of claim prepared and signed by Brice, they did not make an appearance in this matter until ordered to do so by this Court.

Since this Court's decision in *Jones v. Wells Fargo,* 366 B.R. 584 (Bankr.E.D.La.2007), Wells Fargo has represented that it will no longer utilize national counsel for bankruptcy or foreclosure files. Having realized the significant difficulties that were created by its former employment practices, Wells Fargo has elected to employ one firm in each state that will handle all matters involving borrowers located in that state. Local counsel will have the same access to Wells Fargo's computer systems heretofore only enjoyed by national counsel. However, this case was handled under the prior system. Wells Fargo selected its national counsel to represent it in connection with this case. They in turn employed local attorneys: one firm to handle the foreclosure, another firm the bankruptcy, and still another the litigation over the Objection to the proof of claim.

**21.** December 4, 2007 Tr.T. 53:24–55:25. It does not appear that copies of the inspection reports are available to counsel as they are kept with property management, nor are other reports such as brokers price opinions or appraisals made available.

**22.** December 4, 2007 Tr.T. 57:2–15.

port the motion and the financial allegations of the default. The motion is typically filed without Wells Fargo's input or review. Wells Fargo testified that it does not maintain records of the legal documents filed on its behalf but relies exclusively on counsel for this service.

The logic utilized by the BWS in its decision making process is both detailed, court, and *even judge* specific. For example, if under local rules, or even local custom of a particular district or judge, a motion for relief may not be filed until the loan is at least ninety (90) days past due, the computer can be adjusted to notify counsel of the need to file a motion for relief when the debtor's account is past due ninety (90) days rather than the typical sixty (60). Other adjustments to the system can be made to eliminate fees or charges prohibited by a particular jurisdiction or judge within a jurisdiction. In summary, Fidelity MSP and BWS allow Wells Fargo to input the individual demands of a particular investor or note holder as well as a court district or even judge.

Debtor has raised several objections to the administration of her loan by Wells Fargo. The objections involve the imposition of inspection fees; appraisal and broker's price opinion fees; sheriff's costs and commissions; legal fees both incurred both prior to and after bankruptcy; the calculation of Debtor's escrow balance; and language included in Wells Fargo's proof of claim which Debtor maintains is illegal and inappropriate. Debtor complains that the fees, costs, and charges claimed were erroneously imposed, unreasonable, inaccurate and/or not legally due.

In addition, Debtor complains that Wells Fargo failed to properly notify her of changes in the amounts estimated to cover demands against her escrow account and interest rate. Debtor also complains of Wells Fargo's failure to notify her both prior to filing and subsequently thereafter of any costs, charges, or fees imposed on her account. Finally, Debtor complains that Wells Fargo's application of her payments is contrary to the terms of the Note, Mortgage, and applicable law.

*Failure to Notice*

■ In the current case, after the Objection was filed, Wells Fargo amended its proof of claim yet again. The Second Amended Proof of Claim, filed on September 9, 2007, alters the First Amended Proof of Claim by changing the language in "Section 3. Other Information." The new language provides, in part:

A. Claimant is entitled, and reserves the right to receive all amounts which are payable after the petition date under the loan documents described above … including the following payments upon and additions to the total debt:

1. Regular monthly installments as are provided by the loan documents, subject to future adjustments for escrow deposit or interest rate changes.

2. As of August 20, 2007, regular monthly payments are due for the months of September 1, 2007 in the amount of $697.51, late charges have been accrued in the amount of ($0.00), and reasonable and necessary attorney's fees have been incurred for creditor's representation in this proceeding.

3. Late charges, reasonable attorneys' fees, and other amounts of the type described in Section 1A above, as provided for in the loan documents.

This Court's procedures, set forth in Administrative Order 2008–1, dictate the proper method for requesting payment of post-petition fees or costs. The Court finds that this disclaimer is impermissible and notes that Wells Fargo will be subject to sanctions if it attempts to collect any

costs or fees in contravention of the Administrative Order or places this language in any proofs of claim on file in the District.

With regard to the noticing of prepetition charges and costs, this Court previously addressed Wells Fargo's questionable loan administration practices in *In re Jones*, 366 B.R. 584 (Bankr.E.D.La. 2007)("*Jones I*") and *In re Jones*, 2007 WL 2480494 (Bankr.E.D.La.2007)("*Jones II*"); both opinions were entered in the same adversary. The Debtor in *Jones* owned a home that was encumbered by a mortgage held by Wells Fargo. The debtor sold his home in an attempt to use the equity to payoff the amounts due under his plan. The payoff provided by Wells Fargo was considerably larger than the debtor expected, however. As a result, the debtor filed an adversary after Wells Fargo refused to provide a detailed explanation of the charges and fees contained within the payoff. In *Jones I*, this Court thoroughly reviewed Wells Fargo's accounting and determined that $24,450.65 more than was actually due was collected by Wells Fargo at closing. The discrepancy between Wells Fargo's payoff and the amount actually due was the result of a number of errors. First, with regard to the prepetition debt calculation, Wells Fargo improperly reported prepetition foreclosure costs. Second, Wells Fargo assessed additional prepetition charges without amending its claim, notifying the debtor, Court, or Chapter 13 Trustee. Third, Wells Fargo improperly calculated the postpetition debt by failing to show the debtor's account as current on the petition date, an error which caused Debtor to pay thousands of dollars in additional interest. Fourth, Wells Fargo did not report or request Court approval for postpetition fees assessed against the debtor's account and unknowingly paid by debtor from either Trustee or regular installment payments.[23]

The testimony in *Jones* indicated that this conduct was not unique to Jones' account but systematic. One of the primary problems discovered in *Jones* was Wells Fargo's failure to notify borrowers of the assessment of fees, costs, or charges at the time they are incurred. This practice exists during all stages of the loan's administration and is not peculiar to loans involved in a bankruptcy. As a result of its previous experience, the Court specifically directed Wells Fargo to submit into evidence copies of any and all notices to Debtor of fees, costs, or charges incurred.

Wells Fargo supplied a listing of computer generated tasks allegedly applicable to this account.[24] The list provides a date, letter or task number, and description of the event. Copies of the letters allegedly sent were not produced nor were any form letters made available to the Court.[25]

**23.** The Court conducted a hearing on the propriety of sanctions, at which time Wells Fargo offered, *in lieu* of sanctions, to impose certain procedures to notify debtors, counsel, and the Chapter 13 Trustee of fees and costs incurred postpetition. This Court accepted Wells Fargo's offer, and in *Jones II*, set forth the procedures by which Wells Fargo is to handle its loans in cases pending before this Court. *In re Jones*, 2007 WL 2480494, at *5–6 (Bankr. E.D.La.2007). This procedure was implemented by Administrative Order 2008-1. Wells Fargo is in the process of complying with this judgment and a filed a Statement of the Accrual of Post Petition Charges into the record of this case on February 28 and 29. See Docket nos. 56–57. The Statement reflects that no fees, costs, or charges have been incurred on this account since the Petition date.

**24.** Exh. A.

**25.** An exception to this general statement involves escrow and change of interest rate notices which were produced.

According to the list, no correspondence was forwarded to Debtor during the first year of her loan's administration. On December 15, 2000, Debtor was fifteen days late on her monthly installment payment. According to Wells Fargo's accounting records, it assessed a late fee of $27.71 on December 18, 2000, without notice to Debtor. On January 3, 2001, an acceleration letter was allegedly forwarded. What demands or information it included are unknown. On the same day a "30 day solicitation" was performed. Again, what this involved is unclear. Debtor made a payment on January 12, 2001, in the amount of $654.11. Wells Fargo applied the payment to the December installment, then assessed and paid itself a late fee on that installment. The remainder, $72.29, was placed in a suspense account.

On January 17, 2001, the list reflects a "15 day delinquency." It was followed by a "22 day delinquency" on January 23, 2001. Also provided on that date was a "Short Pmt in Suspense" task. Again, no evidence was presented as to the nature or content of these tasks. A review of the entire list indicates that many of the entries that appear are not correspondence, but tasks undertaken by Wells Fargo employees or counsel. Therefore, the Court cannot conclude that the above described delinquencies are notices of past due account delivered to Debtor.[26] The opposite conclusion is more likely, given that several other entries designate "letter" when correspondence is sent.[27]

On January 18, 2001, Debtor's account was charged an additional $27.71 late fee because her payment on January 12th had been applied to the December 1, 2000, installment leaving her January 2001 installment past due. On February 1, 2001, a "30 day solicitation" was allegedly performed. The nature of that solicitation is unknown. On February 9, 2001, another "Short Pmt in Suspense" task is specified on the listing, presumably, a reference to the $72.29 still held in suspense from the January payment. This is the last time Wells Fargo's task records reflect any entry with regard to the Debtor's suspense account despite almost continual use throughout the remaining period of the loan's administration.

On February 12, 2001, Debtor forwarded another payment of $654.11. Wells Fargo applied the payment to the January installment and the late fee assessed on that payment. The remainder of the funds were placed in suspense. On February 17, 2001, a "15 day delinquency" is noted of unknown content, followed by a "22 day delinquency" on February 23, 2001.

For the remaining year, Wells Fargo appears to have entered 15, 22, and 30 day delinquencies as well as acceleration letters. Nothing produced indicates that Debtor was advised that late fees or other charges were being imposed on her account or that funds were being held in suspense rather than being applied to reduce her past due installment. Ms. Miller testified that Debtor was not notified of

---

26. See for example, entry on 10/30/01, "Active Foreclosure" obviously indicating that the file had be transferred for foreclosure action; or entry on 12/27/01 "Foreclosure Payoff." Was this prepared at the Debtor's request or more likely, for Wells Fargo's counsel who needed the payoff for bidding purposes at the pending foreclosure sale in December of 2001?

27. See for example, entry on 1/3/01, "Acceleration letter;" or the 5/16/02 entry, "Search letters sent to Tax Auth." On 9/21/01 Wells Fargo's listing reflects an "ARM change notice."

past due payments, the imposition of late charges, or inspection fees.[28]

Between December 2000 and the filing of the first bankruptcy, approximately one year, thirteen (13) late fees were charged, without notice, for a total of $360.23. Each of these fees were deducted from Debtor's monthly payments, again without notice, deepening her default and ultimately triggering seven (7) property inspections for which Debtor was charged an additional $15.00 each. Again, these charges were assessed against Debtor's account and paid from the monthly installments she was forwarding without notice. The total cost to Debtor for one missed $554.11 installment in December of 2000 was $465.36 in late fees and property inspection charges. Debtor paid an additional $400.00 towards her past due balance in the four months following her default, all of which was promptly applied to satisfy late fees and property inspections charges rather than the past due interest and principal installment as required by the Mortgage. Although Debtor paid her monthly principal and interest payments throughout 2001, plus $400.00, Wells Fargo showed her $619.47 in arrears by October, 2001.

Debtor's October installment payment appears to have been returned by Wells Fargo.[29] Instead of applying her payment, Wells Fargo placed the loan in foreclosure and actively returned at least one other tender in November, 2001.[30] Putting aside late fees and inspection charges, Debtor was only $154.11 in arrears on her monthly

installment at the time her loan was referred for foreclosure.

By the time Debtor's husband filed his case on January 11, 2002 ("2002 Bankruptcy"), Wells Fargo claimed attorney's fees and costs of foreclosure amounting to $2,218.33 in addition to missed installment payments, inspection fees, and late charges. The proof of claim filed in that case itemizes a past due balance of $6,098.10.

Following the dismissal of the 2002 Bankruptcy[31] and during the entire administration of the loan thereafter, Wells Fargo appears to have had little or no contact with Debtor. Save for the delivery of incoherent escrow adjustments and letters regarding a change in interest rate, none of the thousands of dollars in fees, charges, or costs were noticed to Debtor.[32] The Court concludes, just as in *Jones*, that Wells Fargo has a corporate practice that fails to notify borrowers that fees, costs, or charges are being assessed against their accounts. This failure is fatal to Wells Fargo's decision to pay itself from payments sent by Debtor for other purposes and is contrary to the requirements of the Note and Mortgage.

### The Triumph of Computer Logic Over Human Logic

#### Property or "Drive By" Inspections

As previously indicated, the Fidelity MSP and BWS will apply computer logic to certain events, triggering automatic action on a loan file. Wells Fargo testified that in this case the decision paradigm allowed for property inspections if the loan

---

28. December 4, 2007, Tr.T 221:17–224:5.

29. Exh. A, entry 10/12/01 "Return Funds."

30. Exh. A, entry 11/19/01 "Return Funds."

31. Case No. 02–10228 was dismissed on January 29, 2004.

32. Wells Fargo did notify Debtor, in accordance with the terms of the Note, of any adjustment to her interest rate. It also frequently reviewed and adjusted Debtor's escrow account. Unfortunately, the escrow notices were both confusing and in error.

was twenty (20) days past due. According to Wells Fargo, this principle controlled the loan's management both prior to and after bankruptcy filing. Wells Fargo has produced 43 of the 44 inspection reports prepared on Debtor's property.[33] *Since Debtor's first missed payment in December of 2000, Wells Fargo has inspected this property on average every 54 days.*

Wells Fargo argues that the decision to conduct drive-by inspections every time a loan is twenty (20) days past due is reasonable. It maintains that once a debtor is past due, industry experience supports the belief that the collateral is often at risk. As such, inspections are ordered to guard against a potential loss. Wells Fargo further argues that the charges are minor and constitute a reasonable exercise of discretion to manage the risk.[34]

Wells Fargo requests blanket authority to charge every debtor or borrower a fee for a drive-by inspection no matter what the circumstances, provided, in Wells Fargo's view, the loan is twenty (20) days past due. While this might seem both logical and practical at first blush, in practice it is much less so.

In this case, Debtor fell one month behind in December of 2000. Despite Wells Fargo's assertion that property inspections are always ordered when a loan is twenty (20) days past due, this does not appear to be the case. Although Debtor was one month past due in December 2000, and according to Wells Fargo remained so for the rest of 2001, property inspections were not ordered until July 2001.[35] What risk suddenly existed in July 2001 was not explained, but it is clear that Wells Fargo does not have a policy of automatically inspecting properties once a loan is twenty (20) days past due. The six month delay in ordering an inspection calls into question Wells Fargo's assertion that loans twenty (20) days past due constitute a risk to the note-holder justifying immediate inspection.[36]

Once the Fidelity MSP system went into action, a drive by inspection was ordered, performed, and its cost charged to Debtor's account. The first report revealed that the property was occupied, well maintained, and in good condition.[37] The next month, Debtor paid her monthly installment. However, upon its receipt, the computer posted the payment to the previous month's installment. The computer then read a delinquency for August, now twenty (20) days past due. The Fidelity MSP system dutifully recognized the triggering event and ordered yet another drive-by inspection which was performed and charged to Debtor. This chain of delayed payment continued for eight (8) months until the 2002 Bankruptcy was filed. Each month, a drive-by inspection was ordered, performed, and charged to Debtor's account.

---

**33.** The report for the inspection allegedly performed on 7/14/06 has not been produced and Wells Fargo admits it cannot be substantiated.

**34.** While a $15.00 inspection charge might be minor in an individual case, if the 7.7 million home mortgage loans Wells Fargo services are inspected just once per year, the revenue generated will exceed $115,000,000.00.

**35.** Wells Fargo represented that it did not fully automate property inspection requests until July, 2001. December 4, Tr.T. 154:22–155:17.

**36.** For example, in 2003, Debtor fell one month behind but property inspections were not ordered until seven (7) months later. Ten (10) inspections were then ordered over a six (6) month period despite Debtor's continuing payments on a monthly basis. Exh. H.

**37.** Exh. E.

All eight (8) inspections indicated that the property was occupied and well maintained.[38] Because the vendor uploads the finished report directly into Wells Fargo's computer mainframe, the system, rather than a person, checks for the condition of the property and alerts Wells Fargo if a property appears to be at risk.[39] The actual electronic file of the report is stored in the Property Management Department of Wells Fargo but never appears to be read by anyone.

All forty-three (43) reports describe the property as being in good condition. Further, since most were obtained while the Debtor was making regular monthly payments, the paradigm that signaled a risk to the property was imperfect if not inapplicable. In addition, the inspections were of little use to Wells Fargo because *a review of the inspections reveals that many were performed on property other than Debtor's.*

For example, the inspection completed on July 5, 2001, indicates that Debtor's house is of brick construction, while the inspections completed from August to February of 2002 describe a house of frame construction. Obviously, two different properties were inspected. However, since Wells Fargo blindly relied on a computer to both order inspections and evaluate their conclusions, it did not know that the erroneous inspections it received were of no benefit.[40] The failure of Wells Fargo to notice such significant inconsistencies evident on the face of the reports further confirms that they were not reviewed by any human being. If Wells Fargo did not believe the reports were important enough

to read, this calls into question the importance of obtaining the reports in the first place.

Assuming the inspections were properly performed, the other troubling point raised is the frequency of their performance. Forty-four (44) inspections were ordered on one property over a period of seventy-nine (79) months. Every report indicates that the property inspected was in good condition. Why was there a need to continuously reinspect? No answers were supplied. In short, the Court concludes that Wells Fargo's computer system automatically generates these inspections for no discernable purpose or benefit to the lender.

The Court can only conclude that the necessity of performing drive-by inspections is not critical to the administration of a loan. If the first report reveals a property in fair to good condition, nothing justifies, without further evidence of a problem, monthly inspections thereafter. The fact that Wells Fargo does not appear to read the inspections it orders further substantiates this finding.

Paragraph 9 of the Mortgage provides that "[l]ender or its agent may make reasonable entries upon and inspections of the Property. Lender *shall* give Borrower notice at the time of or prior to an inspection specifying *reasonable cause* for the inspection." [41] Ms. Miller testified that Wells Fargo does not send borrowers notice when it performs a property inspection.[42] The Court has already found that Wells Fargo does not notify the borrower that she has incurred a charge for this service.

38. Exh. E.

39. December 4, 2007, Tr. T. 86:3–87:18.

40. Exh. E. This discrepancy is found throughout the reports. Twenty-four (24) reports describe Debtor's home as brick while sixteen (16) describe it as frame construction.

41. Emphasis added.

42. December 4, 2007, Tr.T. 92:1–13.

Wells Fargo is entitled to recover necessary costs incurred in connection with the protection of its rights in the property. The Mortgage specifies that the disbursements shall be payable *upon notice from Lender to Borrower.*[43] Even after notice, the assessment of disbursements attributable to protect the property must be reasonable. In this case, Wells Fargo's imposition of inspection fees was neither noticed nor reasonable.

*Broker's Price Opinions/Appraisal Charges*

■ Wells Fargo ordered nine (9) broker's price opinions ("BPOs"), originally characterized as appraisals in Wells Fargo's proof of claim, on this property in the same seventy-nine (79) month period. Only two BPOs were produced, although invoices delivered by Premiere Asset Services ("Premiere") to Wells Fargo for every BPO were entered into evidence. None of these charges were noticed to Debtor at the time they were incurred.

Wells Fargo testified that when a property is placed in foreclosure, a BPO is ordered.[44] Wells Fargo testified that this property was in a continuous foreclosure proceeding from 2002 until 2007. Multiple BPOs were required because Debtor (or her spouse) filed for bankruptcy relief multiple times. Each time a bankruptcy case was filed, the foreclosure sale was stopped. However after each case's dismissal, the foreclosure sale was rescheduled and a new BPO was necessary.

Debtor did not contest the logic of this explanation, but a review of the account indicates that Wells Fargo ordered many more BPOs than were necessary. Over the life of the loan Wells Fargo charged Debtor:

| | |
|---|---|
| $125.00 | 1/09/02 |
| 125.00 | 3/02/04 |
| 125.00 | 9/30/04 |
| 125.00 | 9/30/04 |
| 125.00 | 9/12/05 |
| 125.00 | 9/12/05 |
| 95.00 | 3/30/06 |
| 95.00 | 3/30/06 |
| 390.00 | 3/06/07 |

The BPOs performed in January 2002 and March 2004 appear to have been completed while Wells Fargo was actively foreclosing on the property.[45] The two BPOs in September of 2004 were completed while Debtor had a bankruptcy pending and an adequate protection order in place.[46] No explanation as to the necessity of these charges was offered and the reports were not produced. In addition, the charges appear to be duplicative.

In September of 2005, two identical BPO charges appear on the account. While one charge appears to be duplicative of the other, it is also unlikely that inspections could have been performed at this time given that Jefferson Parish was under an evacuation order due to Hurricane Katrina and closed to all but emergency personnel. Again, copies of the reports were not produced.

In March of 2006, two identical BPO charges again appear. Both, along with

---

43. Exh. C, Mortgage ¶ 7.

44. In Louisiana, because all foreclosures are by judicial process, if a lender wishes to preserve a deficiency claim, the sheriff must begin the bidding at the initial public auction at 66 2/3% of appraised value. Prior to sale, both borrower and lender are entitled to submit evidence of appraised value. If the values differ, the sheriff will appoint a third party appraiser to reconcile the difference.

45. These are the only two BPOs produced. Exh. G.

46. One of these charges appears to be a duplicate of the other. Wells Fargo may have discovered this sometime later when it reviewed the file for foreclosure. A reversal of costs was entered six months later, in March of 2005, for $125.00. Exh. H.

the BPO charges in September of 2005 and the property inspections ordered post Hurricane Katrina seem to have been reversed on October 13, 2006, due to the "hurricane." [47] The last BPO, in March of 2007, was after the foreclosure on Debtor's home and when the property was owned by Wells Fargo. This charge would not be attributable to Debtor. The Court finds that the only two BPOs properly ordered under Wells Fargo's stated policies were the BPOs ordered in January 2002 and March 2004.

■ An additional objection to the BPOs was asserted by Debtor regarding the amounts charged by Wells Fargo. Wells Fargo's testimony at the trial was that BPOs were secured from Premiere, an independent entity, although affiliated with Wells Fargo. Copies of the invoices representing the amounts "paid" to Premiere were produced. Wells Fargo admitted that the invoices included profit for Premiere although it did not know how much. Wells Fargo insisted that all costs are "passed through" to a borrower's account at the amount actually billed by the third party.

Following this trial, Wells Fargo stipulated in another matter that Premiere is a *division*, not an affiliate, of Wells Fargo, and "invoices" produced as evidence of the costs associated with the acquisition of BPOs are internal memos between departments allocating costs of administration. While it remains true that the BPOs are performed by third party vendors, the amount paid is not what is reflected on the "invoices." Wells Fargo's national counsel has represented to this Court that only $50.00 of each invoice represents the actual cost incurred by Wells Fargo for a BPO.[48] The remaining amounts, approximately $880.00 in total, were added to the actual costs by Wells Fargo. The Court concludes that these additional charges are an undisclosed fee, disguised as a third party vendor cost, and illegally imposed by Wells Fargo.

*Escrow for Insurance and Property Taxes*

■ At closing, borrowers on home mortgage loans must typically prove that adequate insurance exists against the property's loss. Property taxes must also be current. Most mortgage lenders demand at closing assurances that future insurance premiums and property taxes will be paid. Typically, this is accomplished through the use of escrow accounts. Debtor's Note and Mortgage are no exception. The Mortgage allows Wells Fargo to set up an escrow account if Debtor does not maintain adequate insurance. Debtor's loan was not originally set up to include a monthly escrow payment.

In year two, Debtor failed to maintain property insurance. Wells Fargo sent several notices reminding Debtor to provide proof of insurance and warning that Wells Fargo would "force-place" insurance on Debtor's behalf if proof of insurance were not supplied.[49] Despite these warnings, Debtor failed to secure insurance on her home. On March 11, 2001, Wells Fargo paid for a force-placed property insurance policy at a cost of $651.00. Because there was no escrow fund from which to

**47.** Exh. H. Entries on 9/12/05, 3/30/06, and $15.00 of inspection charges on 1/12/06, 2/21/06, 3/14/06, 4/11/06, 5/19/06, 6/12/06, 7/05/06, 7/14/06, 8/3/06, 9/8/06, as well as a trip expense charge for property preservation on 10/10/06 were written off on 10/13/06 for $625.00. Costs of photographs totaling $12.00 remained on the account.

**48.** *See, In re Fitch, Case. No 04–14039.* February 13, 2008 Tr.T. 5:10–6:21.

**49.** Exh. A; December 4, 2007 Tr.T. 162:3–163:15.

make this payment, Debtor was immediately responsible for reimbursing Wells Fargo for this expense.

On April 13, 2001, Wells Fargo sent Debtor a letter notifying her that $144.66 would be added to her monthly installment to reimburse Wells Fargo for this advance.[50] Because force-placed insurance was necessary, Wells Fargo also exercised its right to escrow for estimated future premiums accruing at the policy's annual renewal date.[51]

The monthly escrow amount was allegedly calculated by adding the estimated premium for the next year's renewal to the amounts already paid. In order to ensure that the escrow account would always have a "cushion" over and above that needed to pay for next year's insurance premium, two additional months worth of escrow were collected.[52] To arrive at a borrower's monthly escrow payment, the total of these sums is divided by 12.

Beginning with the June 2001 payment, Wells Fargo increased Debtor's monthly installment by $144.66.[53] This increase does not comply with the terms of the Note, Mortgage, RESPA, or the facts of this case. The Court calculates the amounts required were instead $84.22 per month.[54]

Debtor did not make the additional $144.66 per month payments. Instead, she continued to make regular monthly principal and interest payments of $554.11.[55] Wells Fargo instituted foreclosure proceedings in October of 2001 and Debtor's husband filed the 2002 Bankruptcy in January 2002 after their payments for the October and November installments were refused.

Shortly after the institution of the 2002 Bankruptcy, Wells Fargo again reviewed Debtor's escrow account. The renewal premium of $651.00 for the 2001–2002 policy year had been paid the previous December. Wells Fargo's records reflected a *negative* $1,111.08 balance in Debtor's account

**50.** The Mortgage provides that should Wells Fargo advance funds for insurance or property taxes, it may at its discretion amortize the amounts due from the borrower over twelve months. Through this notice, Wells Fargo elected this option of repayment.

**51.** Although the policy was not placed until March 2001, the policy period ran from November 2000 (the date Debtor's original policy terminated for non-renewal) until November 2001.

**52.** Pursuant to RESPA, a lender may increase the annual amounts held on deposit in escrow by 1/6 of the estimated amount due. Section 10, RESPA. This arguably would keep Debtor's escrow account in positive balance even if the premium for the following year increased. However, since the change in Debtor's monthly payment did not take effect until June of 2001, even at its inception, the calculations used by Well Fargo would render Debtor's escrow account short in November 2001 when the next premium payment was due.

**53.** Exh. B.

**54.** Mathematically the amounts owed included $651.00 for the 2001–2002 premium and $651.00 estimated as necessary to satisfy the 2002–2003 premium. To this sum is added $108.50 (calculated as (($651.00 divided by 12) × 2)). Then the total is divided by 12. The result is a monthly escrow payment of $117.54. However, since Wells Fargo should have held $399.89 in Debtor's suspense account at the time, the total due should have been reduced by the balance in Debtor's suspense account. The over-payments reduced Debtor's monthly escrow payment to $84.22.

**55.** Debtor paid at least $554.11 every month from January 2001–November 2001. In September of 2001 her entire payment was placed in suspense and remained unapplied as late as January 2002 when the bankruptcy was filed. Her October and November 2001 payments were returned.

as of January 2002.[56] However, Wells Fargo's proof of claim filed in that proceeding reflected no past due escrow balance.[57]

Under questioning by Debtor, Ms. Miller explained that when a proof of claim is generated, the computer will assume that any past due installment payments included in the proof of claim are current. This updates the escrow balance because the computer "assumes" that the portion of the past due installments attributable to escrow have been added to the balance on the petition date. The computer then compares the adjusted balance to the balance actually needed in the account and only schedules the difference as either a positive or negative on the proof of claim.[58]

Assuming this testimony is correct, the computer would have added $144.66 for the six (6) past due monthly installments included in the proof of claim. This would have adjusted the negative balance to $243.12, which together with $108.50, should have been reflected on the proof of claim. According to Ms. Miller, this sum should have been included on the proof of claim.[59] Obviously this was not done, calling into question Ms. Miller's understanding of how the Fidelity MSP/BWS system calculates escrow balances.

But there are greater problems with Wells Fargo's calculations. As previously stated, the Mortgage requires Wells Fargo to apply any funds received first to the payment of outstanding escrow charges, then to accrued interest, then to outstanding principal. Only after all these amounts are paid can late fees or inspection charges be satisfied. Throughout 2001, and while a single monthly installment of principal and interest remained outstanding, Wells Fargo satisfied late charges and inspection fees instead of the principal and interest outstanding. Then, in March of 2001, when the first insurance premium payment was made, Wells Fargo again preferred the payment of late fees and inspection charges to that of insurance. The result is that Debtor's escrow account is wholly incorrect.[60]

Table II reflects the Court's calculations for the escrow account after reapplying the payments as required by the Mortgage and using correct escrow calculations. The balance in January 2002 was negative $396.79, with escrow payments current through December 31, 2001. Assuming this discrepancy was added to the proof of claim, Debtor's new escrow payment would be $63.29 for 2002.[61]

In April of 2003, the escrow account was reviewed again. This time the premium paid in December of 2002 was $744.00. Wells Fargo calculated the necessary escrow payment at $158.48 per month. Wells Fargo advised Debtor that her new payment, beginning June 2003, would increase to $712.59.[62] The Court finds this is erroneous and holds that the proper amount was $625.15. The Court calculates that the escrow payment was actually $71.04.[63]

---

56. Exh. H.

57. See Wells Fargo's Proofs of Claim filed in bankruptcy case no. 02–10228.

58. December 4, 2007 Tr.T. 204:10–205:22.

59. Under Ms. Miller's explanation, the negative balance was really $351.62 because an additional $108.50 (1/6 of the estimated yearly insurance premium) should have also been included.

60. Exh. H.

61. See Table II.

62. Exh. B.

63. See Table II.

Wells Fargo apparently realized that it had over-calculated Debtor's escrow deficiency for 2003, because its next analysis, performed on May 4, 2004, calculated an estimated surplus of $784.68 rather than the allowable low point of $108.50. This dropped the monthly payments back down to $608.33 or $54.22 per month for escrow.[64]

In April 2005, the escrow review changed Debtor's payment to $613.10.[65] In September 2005, her Note interest rate changed increasing her payment to $628.67.[66] The following August, the escrow review changed the payment to $623.91,[67] and in December 2006, the interest rate changed yet again modifying the payment to $675.79.[68] Finally, in June 2007, Wells Fargo changed Debtor's installment payment to $697.51.[69] Throughout this period, Debtor continued to pay $712.59 per month, at least until Hurricane Katrina occurred.[70] After August 2005, all payments ceased.

The correct escrow calculations based on the Note, Mortgage, and RESPA are set forth on Table II attached to these Reasons. These figures are used by the Court to amortize the loan rather than the incorrect calculations presented by Wells Fargo.

*Late Charges*

■ Debtor missed her first installment payment in December, 2000, however, she resumed making timely payments on January 12, 2001. Wells Fargo assessed a late charge for the missed December, 2000, payment and it assessed a $27.71 late charge for each month that followed because Debtor remained contractually one month behind.[71]

Paragraph 27 of the Mortgage allows the lender to assess late charges, and provides: "[b]orrower shall pay to Lender a late charge of 5 percent of any monthly installment of principal and interest as provided in the Note not received by Lender within 15 days after such installment is due." Additionally, Paragraph 7(A) of the Note provides that the Debtor will pay the "late charge promptly, but only once on each late payment." Louisiana law permits lenders to assess late charges if agreed to by the parties.[72]

As stated above, the Mortgage allows Wells Fargo to collect a late charge if a payment is more than fifteen (15) days delinquent. The Mortgage does not, however, allow Wells Fargo to assess a late charge for each subsequent month until the default is cured. If a borrower misses a payment in December 2000, but makes timely payments in January, February, and March of 2001, the borrower has missed one payment, not four. Wells Fargo, however, reads the relevant provision to allow an assessment for each month until the borrower cures the initial default. This interpretation is unreasonable.[73]

---

64. Exh. B.

65. Exh. B.

66. Exh. D.

67. Exh. B.

68. Exh. D.

69. Exh. B.

70. Exh. H.

71. Exh. H.

72. *See* La.R.S. §§ 6:1097 and 9:3505.

73. *See* 12 C.F.R. § 227.15, which provides that "it is an unfair act or practice for a bank to levy or collect any delinquency charge on a payment, when the only delinquency is attributable to late fees or delinquency charges assessed on earlier installments, and the payment is otherwise a full payment for the applicable period and is paid on its due date or within an applicable grace period." While

The result of Wells Fargo's position in this case is the imposition of a fine or penalty of $360.23 in late fees over a thirteen (13) month period for one $554.11 missed payment.[74] During this same period the past due principal balance on the missed payment continued to bear interest. Therefore, the imposition of the late fee was a penalty for the failure to pay accrued interest. The penalty amounted to an additional charge of 100% per annum.[75] The Court does not find this a reasonable interpretation of the contract's terms.

■ Ambiguity in a contract is construed against the drafter; Wells Fargo.[76] The Note provides that only one penalty may be assessed for a missed payment. Given that the Debtor made regular installment payments throughout the life of her loan, the Court interprets the Mortgage to allow the assessment of one late charge on any payment not received within fifteen (15) days of the date due, but not for each and every month following until the initial default is cured.

*The Adequate Protection Order*

■ On April 20, 2004, Debtor filed her own bankruptcy ("2004 Bankruptcy").[77] Thereafter, Debtor failed to make postpetition payments to Wells Fargo for May 2004 through August 2004. A motion for relief was filed and a consent order entered allowing Debtor to add the "June 2004 through and including August 2004 post petition payments, late charges and attorneys fees and costs of $500.00 . . ." to her plan. Wells Fargo represented that this totaled $2,859.99.[78] In reviewing this case, the Court noticed that Wells Fargo's amended proof of claim filed on November 4, 2004, itemized the new additions as follows:

| | |
|---|---:|
| 3 payments @ 608.33 | $1,824.99 |
| Bankruptcy fees | 125.00 |
| Property preservation fee | 380.00 |
| NSF fees | 30.00 |
| Attorney's fees | 500.00 |
| | $2,859.99 [79] |

The Court Order did not approve a bankruptcy fee of $125.00, nor did it approve property preservation fees of $380.00. Further, NSF fees were not disclosed or approved. Judging from its accounting, it appears Wells Fargo attempted to claim approximately twenty-six (26) prepetition property inspections dating back to October 2001 in this Adequate Protection Order without disclosing this to the Court or trustee.[80] This action was a clear violation of counsel's duty to be candid with the Court, but even more disturbing is Wells Fargo's willingness to take advantage of an elderly, *pro se*, widow. Needless to say, the additional charges are disallowed if not already stricken under the other findings contained in these Reasons.[81]

---

this section regulates consumer credit transactions, the Court cannot see how such an act is any less unfair when it concerns a real estate transaction.

74. Added to this outrage are an additional $105.00 in inspection fees charged over seven (7) months. If Wells Fargo had followed its policies to the letter, this sum could have been as high as $195.00.

75. The imposition of a 100% penalty is particularly unreasonable given that Wells Fargo never notified Debtor that it had imposed a late fee and never demanded payment.

76. *Matter of U.S. Abatement Corp.,* 79 F.3d 393, 400 (5th Cir.1996).

77. Case No. 04–12889.

78. *In re Stewart,* Case No. 04–12889, P–43.

79. *In re Stewart,* Case No. 04–12889, claim No. 3.

80. Exh. H.

81. The amounts due are reflected on Table IV.

*Attorney Fees and Costs*

 Between Debtor and her deceased husband, her home has been the subject of a continuous foreclosure proceeding as well as three bankruptcies. As might be expected, Wells Fargo has incurred a considerable amount of attorneys' fees and costs since Debtor missed her first payment in December, 2000. Both the Mortgage, Note, and Louisiana law allow a lender to collect the reasonable fees and costs incurred by legal counsel in connection with enforcement of the lender's rights.

Wells Fargo has submitted invoices totaling $8,632.46 in fees and costs associated with foreclosure actions. The accounting also reflects a $614.91 refund by the sheriff that is not included in its counsel's invoices.[82] The costs of a separate eviction proceeding were also charged to Debtor. They amounted to $3,082.00, but on further research, Wells Fargo determined that a credit of $1,800.00 was due on these fees, reducing them to $1,282.00.[83]

Wells Fargo also included two charges of $150.00 for bankruptcy fees and $500.00 for costs and fees associated with the filing of its Motion for Relief from the Automatic Stay.

The foreclosure fees and costs reflected in Wells Fargo's accounting and invoices, as of January 2002, match exactly the amounts set forth in its initial proof of claim filed in the 2002 Bankruptcy, with one exception. Legal fees were not charged at the rate of $900.00, but $775.00, according to counsel's invoice. The foreclosure fees, as of 2002, are therefore reduced to $1,968.33.

A charge of $150.00 was assessed for preparation of the proof of claim in the 2002 Bankruptcy. That fee was neither approved by the Court nor disclosed to anyone. It is therefore disallowed.

After the dismissal of the 2002 Bankruptcy, Wells Fargo rescheduled the property for sheriff sale. Additional fees and costs of $1,528.61 were incurred. Therefore, as of April 2004, the total fees and costs incurred were $3,496.94.

After the 2004 Bankruptcy was filed, another $150.00 proof of claim fee was assessed. This fee was not approved by the Court in the 2004 Bankruptcy and it is disallowed. Also, during the 2004 Bankruptcy, Wells Fargo filed a Motion for Relief from the Automatic Stay. A consent order for adequate protection was entered by the Court.[84] That Order awarded Wells Fargo fees and costs incurred in connection with the motion of $500.00. The Court recognizes that award as additional fees due Wells Fargo.

Following the dismissal of the 2004 Bankruptcy, the foreclosure process began anew. This time a sheriff's deposit of $1,500.00 was posted. Costs of $185.00 were billed against this deposit, then Hurricane Katrina interrupted the foreclosure. On November 14, 2005, the sheriff refunded $614.91 to Wells Fargo of the $1,315.00 remaining on deposit. Since Wells Fargo did not supply an accounting of the $700.09 in additional costs incurred, they are disallowed. Allowed fees now total $4,181.94.[85]

In late 2006, Wells Fargo rescheduled its foreclosure sale. Following the sale, counsel billed Wells Fargo an additional $3,772.61. The amounts reflected on counsel's statement cannot be reconciled with the previous invoices supplied. The state-

---

**82.** Exh. H, entry November 14, 2005.

**83.** September 25, 2007 Tr.T. 10:15–18.

**84.** *In re Stewart,* Case No. 04–1288, P–43.

**85.** Exh. F.

ment gives a credit for previous billings by the sheriff of $2,612.44 but the previous invoices indicate that $3,607.03 had been paid. Without detail on the credit, these invoices must be reduced to $2,779.02.[86]

■ In December 2006, Wells Fargo instituted an eviction proceeding against Debtor. Fees and costs billed to Debtor's account totaled $2,120.00. However, $1,800.00 was refunded and is due to Debtor. Wells Fargo also charged Debtor's account $450.00 for the cost of a title policy. This is not appropriate as the policy was acquired after Wells Fargo foreclosed on the property and this cost is associated with ownership, not collection. Wells Fargo also charged for clerk and sheriff's costs of $122.00 already included in the original $2,120.00 billed.[87] Total fees and costs allowed for the eviction are therefore $320.00.

Total fees and costs as of March 2007 are:

| | |
|---|---|
| Fees and costs 2002 | $1,968.33 |
| Fees and costs 2004 | 1,528.61 |
| Bankruptcy Fees | 500.00 |
| Fees and costs 2005 | 185.00 |
| Fees and costs 2006 | 2,779.02 |
| Eviction | 320.00 |
| Total Fees and costs | $7,280.96 |

*Suspense Accounts and the Application of Payments*

Debtor's first payment was due January 1, 2000, in the amount of $544.11. She paid $556.00 on January 10, 2000, and Wells Fargo applied $554.11 toward principal and interest. The excess payment of $1.89 was applied toward principal. Debtor made timely payments in the amount of $554.11 for the months of February through November of 2000.[88]

Debtor missed her December 2000 payment. Wells Fargo did not provide evidence that a past due notice was delivered to Debtor. Debtor's next payment was made January 12, 2001 in the amount of $654.11. Wells Fargo applied $554.11 toward the December 2000 installment, paid a $27.71 late fee, and placed the remaining $72.29 into a "suspense account."[89]

Ms. Miller did not know if Debtor was advised of her suspense balance, nor could she prove that Debtor had been notified that a late fee had been charged against her account. For all Debtor knew, her payment of $654.11 had satisfied her January 2001 installment and $100.00 of the past due December payment. Instead, Wells Fargo applied the payment to one installment and charged her an unnoticed late fee. Not only does this Court have a serious problem with the application of a payment to an undisclosed fee, but it also finds that Wells Fargo's application of funds is contrary to the terms of its Note and Mortgage.

Under the Note and Mortgage, payments are to be applied first to outstanding escrow installments, then accrued interest, then accrued principal, *and last to late fees.* Therefore, the $654.11 payment

---

86. Exh. F.

87. Exh. F.

88. Exh. H.

89. Suspense accounts are utilized by Wells Fargo when the payment received does not match the monthly installment. For example, on May 11, 2001, Debtor forwarded a payment of $554.11 to Wells Fargo which was immediately placed in suspense rather than immediately applied because it did not include the unnoticed late fee of $27.71. In January of 2001, Debtor's payment was sufficient to pay her December installment but was not enough to also fully satisfy her January 2001 installment. Rather than apply a partial payment, Wells Fargo simply deposited the money into a suspense account. *See also, In re Nosek,* 2006 WL 1867096, at *3 (Bankr.D.Mass.2006).

should have been applied to her past due December installment.

This would have left January's installment of $554.11 outstanding, as well as the late fee of $27.71. Debtor's balance in suspense would have been $100.00 because, until the January installment was satisfied, late charges could not be paid. This misapplication of payments continued throughout 2001.

The problem worsened after July 2001, when Wells Fargo began ordering property inspections because the loan was technically twenty (20) days past due. The costs of inspection, $15.00 per month, were assessed and paid without notice, prior to the satisfaction of outstanding principal, accrued interest, and insurance premiums.

This created not only a burgeoning default but also another review of Debtor's escrow account. The review resulted in the third adjustment to her monthly installment in a six month period. Yet again, Wells Fargo miscalculated the amount required.

Debtor attempted to keep pace with this rising tide, but in November of 2001, after having two payments refused and a foreclosure instituted, Debtor appears to have given up. Debtor's spouse filed bankruptcy *pro se* in January of 2002.

The proof of claim filed by Wells Fargo in that case reflected the following charges:

| | |
|---|---:|
| 6 payments @ 698.77 (8/1/01–1/1/02) | $4,192.62 |
| Accrued late charges (3) | 83.13 |
| Foreclosure fees and costs 1193.33 | |
| 900.00 | 2,093.33 |
| Inspection fees | 30.00 |
| Property preservation | 15.00 |
| Suspense Balance | (440.98) |
| Misc foreclosure fees (BPO) | 125.00 |
| Total: | $6,098.10 [90] |

Based on Wells Fargo's accounting, this proof of claim was substantially in error. The correct amount of her monthly installment should have been $638.33 not $698.77. Had Wells Fargo properly applied Debtor's extra payments to escrow, Debtor would have been current in her escrow account through December 31, 2001. Based on the Court's revised accounting, Debtor owed six (6) principal and interest payments of $554.11 when the 2002 Bankruptcy was filed. Debtor's suspense account had a positive $48.79 balance and her escrow account a negative $396.79. To this must be added the escrow payment of $63.29 due for January 2002. The BPO charge listed on the proof of claim has been addressed and reduced from $125.00 to $50.00 and all late fees but one have been disallowed. An inspection fee of $15.00 is allowed because Debtor was twenty (20) days late on the December 2000 payment. Because no proof of the property preservation fee was presented at trial, that charge is disallowed. Attorney's fees and costs have been previously reduced due to the credit for $125.00 on counsel's invoice. The net effect is a past due balance of $5,796.99.[91]

Debtor paid her monthly installments on a timely basis from February 2002 through October 2002. She missed her November 2002 payment but managed to become current through later payments. At the dismissal of the case in January of 2004, Debtor was postpetition current. Debtor's husband's plan payments netted Wells Fargo an additional $1,090.46 on its past due claim. She also had $40.64 in her suspense account. The Court has applied the plan payments and prepetition Debtor suspense account to satisfy the proof of claim escrow balance of $411.29. The remaining plan payments and postpetition

---

90. *In re Stewart,* Case No. 02–10228, Claim No. 2.

91. See Table III.

suspense account balance have been applied to Debtor's past due installment payments.[92]

Three months later, in April of 2004 when Debtor filed the 2004 Bankruptcy, Wells Fargo's proof of claim stated:

| | | |
|---|---|---|
| 5 Payments @ 712.59 | | $3,562.95 |
| 5 Payments @ 712.58 | | 3,562.90 |
| Accrued late charges (22) | | 609.46 |
| Foreclosure fees and costs | | |
| | $1,302.42 | |
| | 561.89 | |
| | 750.00 | 2,614.31 |
| Bankruptcy fees | | 150.00 |
| Inspection fees (20) | | 300.00 |
| BPO fees (2) | | 250.00 |
| Property preservation | | 240.00 |
| Tax research fee | | 20.00 |
| Total | | $11,309.62 [93] |

This proof of claim is also significantly in error. As previously stated, at the time the 2002 Bankruptcy was dismissed, Debtor had made all postpetition installment payments to Wells Fargo. Therefore, only the past due installments from the previous case were outstanding, and even they had been partially satisfied by the Trustee in the 2002 Bankruptcy. Debtor had missed three additional payments between the bankruptcy cases (February 1, 2004– April 1, 2004). Added to this were additional foreclosure costs and fees. Since Debtor had made every postpetition payment timely save one, there should not have been any additional late charges or inspection fees on the account except perhaps one of each in November of 2002. Late fees were assessed between January 2004 and April 2004. As a result, only four (4) additional late fees are recognized. Wells Fargo's assessment of twenty-two (22) late charges is directly attributable to the incorrect assessment of escrow charges and, therefore, the calculation of the monthly installment. Because the assessment was due to Wells Fargo's error, they are disallowed, along with the inspection fees which were never noticed. The bankruptcy attorney's fees have been previously discussed and disallowed. Property preservation fees have not been substantiated, and, therefore, are disallowed as is the tax research fee which does not appear in the accounting at all. The allowed BPO fees (one prior to the 2002 Bankruptcy and one prior to the 2004 Bankruptcy) are reduced to a total of $100.00.

The arrearage in the second case was $8,153.30.[94] To this amount, adequate protection sums ordered in September 2004 must be added:

| | |
|---|---|
| 3 payments (6/04–8/04) @ $554.11 | $1,662.33 |
| 3 escrow payments @ 38.65 | 135.63 |
| 5 late charges | 138.55 |
| Attorney's fees and costs | 500.00 |
| Total | $2,436.51 |

Against this arrearage Debtor paid $3,120.00, of which $271.26 should have been applied to Debtor's escrow account and the rest to accrued interest and principal. In addition, Debtor's suspense account contained $483.73. As of July 2005, Debtor had a past due balance of $6,986.08.[95]

Hurricane Katrina hit the New Orleans area approximately one month after Debtor's 2004 bankruptcy was dismissed. She did not make any payments after the date of her dismissal. By directive from Fannie Mae and Freddie Mac, payments on all home mortgage loans in the New Orleans area were suspended.[96] In 2006, Wells Fargo resumed its foreclosure proceed-

---

92. *See,* Table III.

93. To this, Wells Fargo added $2,859.99, under the Adequate Protection Order, for a total claim of $11,555.35. *In re Stewart,* Case No. 04–12889, Claim No. 3.

94. See Table IV.

95. See Table V.

96. December 4, 2007 Tr.T 304:20–25.

ings, selling the property at public auction. Thereafter, it began eviction proceedings.

Following the foreclosure, Debtor was contacted by another division of Wells Fargo regarding the possibility of a reverse mortgage. Convinced by Wells Fargo that she could qualify for a reverse mortgage, Debtor in turn convinced Wells Fargo's mortgage loan department to unwind the foreclosure sale. Debtor was refused the reverse mortgage loan and the entire foreclosure process was put back in motion. During the period between August 2005 and June 2007, Wells Fargo ordered eleven (11) more property inspections and four (4) BPOs. All these charges were reversed in March of 2007. Sheriff's fees of $185.00 incurred in July 2005 have been allowed. Legal fees and costs associated with the eviction proceeding have been previously adjusted to $320.00.

The Court has made the above corrections to Debtors's loan history. The corrected accounting appears on Table I. The past due amount owed to Wells Fargo as of the petition date is $24,924.10, not the $35,036.00 claimed by Wells Fargo in its latest proof of claim.[97]

### Damages and Sanctions

*Accounting and Administrative Abuses*

The reconciliation of Debtor's account took Wells Fargo four months to research and three hearings before this Court to explain. An account history was not produced until two months after the filing of the Objection. An additional two months were spent obtaining the necessary information to explain or establish the substantial charges, costs, and fees reflected on the account.

In the end, Wells Fargo charged nine (9) BPOs to Debtor's account but could only produce two corresponding reports. At least three sets of BPOs were duplicative of each other; two BPOs were probably never performed due to the closure of Jefferson parish following Hurricane Katrina; and all contained hidden fees for Wells Fargo disguised as costs. Only two BPOs were ultimately accepted as validly performed.

Wells Fargo charged Debtor with forty-four (44) inspections; the Court allowed one (1). Wells Fargo also charged Debtor forty-nine (49) late charges; only ten (10) of which were approved. Almost every disallowed inspection and late fee was imposed while Debtor was making regular monthly payments, was assessed under circumstances contrary to Wells Fargo's stated policies or the Note's terms, and was unreasonable under the circumstances. Substantial legal fees were also claimed without over $1,800.00 in credits being posted.

The calculation of Debtor's monthly escrow was almost incomprehensible and virtually incorrect in every instance. This caused Wells Fargo to demand substantially erroneous and increased payments from Debtor. But one of the most troubling problems with the accounting delivered by Wells Fargo was the preference for the payment of fees and charges over escrow, principal, and interest payments in contravention of the Note and Mortgage's clear terms.

In *Brantley v. Tremont & Gulf Railway Co.*,[98] the Louisiana Supreme Court established that a plaintiff that sustained damages as a result of the fault of the defendant, will not be denied a recovery merely because he cannot establish exactly the amount suffered. La. Civil Code Art. 1999 provides, "[w]hen damages are insuscepti-

97. See Table VI.

98. 226 La. 176, 75 So.2d 236, 239 (1954).

ble of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." [99]

In cases where there are no intentional breaches of contract and no actual damages are proven, Louisiana courts have allowed for the recovery of nominal damages for technical breach of a contract.[100] Damages in excess of nominal amounts have also been awarded.[101]

■■■■■■ In addition, Louisiana law recognizes the doctrine of abuse of rights. Although invoked sparingly, it was affirmed in *Illinois Central Gulf Railroad Co. v. International Harvester Co.*[102]

> In its origin, the abuse of rights doctrine was applied to prevent the holder of rights or powers from exercising those rights exclusively for the purpose of harming another, but today most courts in civil law jurisdictions will find an act abusive if the predominant motive for it was to cause harm.... The doctrine has been applied where an intent to harm was not proven, if it was shown that there was no serious and legitimate interest in the exercise of the right worthy of judicial protection ... Although there are still pending important questions concerning its scope as well as criteria for the definition of abusive use of rights, this we may safely say now: it will be difficult for a holder of an individual right, in most of the civil jurisdictions today, to exercise such right to the

detriment of other parties, just for the sheer sake of exercising it. At least a 'serious and legitimate interest' will have to be shown in order to justify the exercise of its right.[103]

Because this Court awards Debtor the sums set forth below as sanctions, it will not award nominal damages for the technical breaches of the Note and Mortgage's terms including, the illegal imposition of fees disguised as costs (BPO charges); the negligent imposition of fees and costs not due (legal charges and deposits reimbursed); the improper calculation of escrow payments; the misapplication of payments contrary to the terms of the Note and Mortgage; the failure to notify Debtor of fees and charges imposed on her account; or Wells Fargo's abusive behavior with regard to its rights under the Note and Mortgage, in particular, the abusive imposition of unwarranted fees and charges (late fees and inspection costs).

*Improper Conduct in Connection With Bankruptcy Filings*

Although Wells Fargo was specifically asked to reconcile the amounts reflected on its prior proofs of claim with the amounts claimed on its account history, it did not. A review by the Court revealed why: the proofs of claim filed in the 2004 and 2007 Bankruptcies were so significantly erroneous that a reconciliation was not possible. Charges for NSF fees, tax searches, property preservation fees, and unapproved bankruptcy fees appeared on

**99.** La. Civ.Code Ann. art. 1999 (1985).

**100.** *Levy v. Southern Bell Telephone and Telegraph Co.,* 172 So.2d 371 (La.App. 4th Cir. 1965); *Fiesta Foods, Inc. v. Ogden,* 159 So.2d 577 (La.App. 1st Cir.1963); *Mayeux, Bennett, Hingle Ins. Agency, Inc. v. Southern Bell Telegraph & Telephone,* 148 So.2d 771 (La.App. 4th Cir.1963), *cert. denied,* 244 La. 131, 150 So.2d 589, and *Meyer v. Succession of McClellan,* 30 So.2d 788 (La.App.Orleans 1947).

**101.** *See, Scheinuk The Florist, Inc. v. Southern Bell Telephone & Telegraph Co.,* 128 So.2d 683 (La.App. 4th Cir.1961) and *Mayeux, supra.*

**102.** 368 So.2d 1009 (La.1979).

**103.** *Id.* at 1014, citations omitted.

the proofs of claim filed in this and previous cases without explanation or substantiation. Further, these charges never appeared as entries on the account history.

Another problem with the proof of claim was the incorrect reporting of Debtor's escrow account balance. First, the escrow account was wholly inaccurate because Wells Fargo miscalculated the amounts due. This caused Wells Fargo to demand substantially more each month than was allowed under RESPA. Wells Fargo also misapplied payments on the Note, further compounding the problem.

The miscalculation of monthly escrow payments also overstated Debtor's monthly installment and corresponding arrears. The combination of all these errors led to substantial overstatements in the past due amounts owed by Debtor in the approximate amount of $3,100.00 in 2004 and over $10,000.00 in 2007.

The Court is also offended by the insertion of additional bankruptcy fees and charges in the consent adequate protection order entered in the 2004 Bankruptcy. Wells Fargo represented to the Court that the $2,859.99 contained in the order represented "June 2004 through and including August 2004 post petition payments, late charges and attorneys fees and costs of $500.00 ..." Instead, Wells Fargo included additional "bankruptcy fees" of $125.00, property preservation fees of $380.00, and NSF fees of $30.00. The property preservation fee was actually composed of twenty-six (26) *prepetition*, previously undisclosed, property inspection charges left off the proof of claim. The Court finds the actions of Wells Fargo to have been duplicitous and misleading.

The Court finds that Wells Fargo was negligent in its practices and took insufficient remedial action following this Court's rulings in *Jones v. Wells Fargo* to remedy problems with its accounting.

The Court will assess damages in the amount of $10,000.00, plus $12,350.00 in legal fees, for the abusive imposition of unwarranted fees and charges (late fees and inspection costs); the illegal imposition of fees disguised as costs (BPO charges); the negligent imposition of fees and costs not due (legal charges and deposits reimbursed); the improper calculation of escrow payments; the misapplication of payments contrary to the terms of the Note and Mortgage; the failure to notify Debtor of fees and charges on her account; and the improper payment of unnoticed fees and charges during pending bankruptcies. The Court will also sanction Wells Fargo in the amount of $2,500.00 for its actions in connection with presenting a consent adequate protection order to the Court, which did not reflect the agreement between the parties as represented to the Court. Finally, the Court will sanction Wells Fargo $2,500.00 for filing significantly erroneous proofs of claim in 2004 and 2007 and misrepresenting the costs associated with Premiere.

In order to rectify this problem in the future, the Court orders Wells Fargo to audit every proof of claim it has filed in this District in any case pending on or filed after April 13, 2007, and to provide a complete loan history on every account. For every debtor with a case still pending in the District, the loan histories shall be filed into the claims register and Wells Fargo is ordered to amend, where necessary, the proofs of claim already on file to comply with the principles established in this case and *Jones*. For closed cases, Wells Fargo is ordered to deliver to Debtor, Debtor's counsel and Trustee a copy of the accounting.

The Court will enter an administrative order for the review of these accountings and proofs of claim. The Court reserves

the right, if warranted after an initial review of the accountings, proofs of claim and any amended claims filed of record, to appoint experts, at Wells Fargo's expense, to review each accounting and submit recommendations to the Court for further adjustments based on the principles set forth in this Memorandum Opinion and *Jones*.

Table I

| Date Rcvd | Description | Installment Date | Amt Rcvd | Trustee Arrears | Principal | Interest | Escrow | Late Fees | Other | Principal Balance | Debtor Suspense | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01/00 | Origination; interest 10.375% | 01/01/00 | | | | | | | | $61,175.01 | | |
| 01/10/00 | Installment Payment | 01/01/00 | $556.00 | | $27.09 | $528.91 | | | | $61,147.92 | | Surplus $1.89 paid toward principal |
| 02/08/00 | Installment Payment | 02/01/00 | $554.11 | | $25.44 | $528.67 | | | | $61,122.48 | | |
| 03/13/00 | Installment Payment | 03/01/00 | $554.11 | | $25.66 | $528.45 | | | | $61,096.82 | | |
| 04/10/00 | Installment Payment | 04/01/00 | $554.11 | | $25.88 | $528.23 | | | | $61,070.94 | | |
| 05/08/00 | Installment Payment | 05/01/00 | $554.11 | | $26.10 | $528.01 | | | | $61,044.84 | | |
| 06/12/00 | Installment Payment | 06/01/00 | $554.11 | | $26.33 | $527.78 | | | | $61,018.51 | | |
| 07/13/00 | Installment Payment | 07/01/00 | $554.11 | | $26.55 | $527.56 | | | | $60,991.96 | | |
| 08/14/00 | Installment Payment | 08/01/00 | $554.11 | | $26.78 | $527.33 | | | | $60,965.18 | | |
| 09/11/00 | Installment Payment | 09/01/00 | $554.11 | | $27.02 | $527.09 | | | | $60,938.16 | | |
| 10/16/00 | Installment Payment | 10/01/00 | $554.11 | | $27.25 | $526.86 | | | | $60,910.91 | | |
| 11/10/00 | Installment Payment | 11/01/00 | $554.11 | | $27.48 | $526.63 | | | | $60,883.43 | | |
| 12/18/00 | Late Charge | | | | | | | $27.71 | $15.00 | | | |
| 01/12/01 | Installment Payment | 12/01/00 | $654.11 | | $27.72 | $526.39 | | | | $60,855.71 | $100.00 | |
| 02/12/01 | Installment Payment | 01/01/01 | $654.11 | | $27.96 | $526.15 | | | | $60,827.75 | $100.00 | |
| 03/01/01 | Hazard Premium | | | | | | ($651.00) | | | | | |
| 03/12/01 | Installment Payment | 02/01/01 | $654.11 | | $28.20 | $525.91 | | | | $60,799.55 | $100.00 | |
| 04/11/01 | Installment Payment | 03/01/01 | $654.00 | | $28.45 | $525.66 | | | | $60,771.10 | $99.89 | |
| 05/11/01 | Installment Payment | 04/01/01 | $554.11 | | $28.69 | $525.42 | | | | $60,742.41 | | |
| 06/01/01 | Applied Debtor Suspense | | $399.89 | | | | $399.89 | | | | ($399.89) | |
| 06/08/01 | Installment Payment | | $554.11 | | | | $84.22 | | | | $469.89 | Table II for monthly escrow calculation |
| 07/10/01 | Installment Payment | 05/01/01 | $554.11 | | $28.94 | $525.17 | $84.22 | | | $60,713.47 | ($84.22) | |
| 08/13/01 | Installment Payment | 06/01/01 | $554.11 | | $29.19 | $524.92 | $84.22 | | | $60,684.28 | ($84.22) | |
| 09/12/01 | Installment Payment | 07/01/01 | $554.11 | | $29.42 | $524.69 | $84.22 | | | $60,654.86 | ($84.22) | |
| 10/01/01 | | | | | | | $84.22 | | | | ($84.22) | |
| 11/01/01 | | | | | | | $84.22 | | | | ($84.22) | |
| 12/12/01 | Hazard Premium | | | | | | ($651.00) | | | | | |
| 01/11/02 | 02-10228 Bankruptcy filed | Totals | | | | | ($396.79) | $27.71 | $15.00 | | $48.79 | Table III |
| 01/11/02 | Debtor Suspense Applied | | | | | | $48.79 | | | | ($48.79) | |
| 01/11/02 | Adjustment to Escrow for POC | | | | | | $348.00 | | | | | |
| 01/11/02 | Adjustment to Escrow for POC | | | | | | $63.29 | | | | | 1/01/02 escrow payment |
| 02/11/02 | Installment Payment | 02/01/02 | $608.00 | | $29.70 | $524.41 | $63.29 | | | $60,625.16 | $544.71 | Table II for monthly escrow calculation |
| 02/15/02 | Installment Payment | 02/01/02 | $789.18 | | $29.96 | $524.15 | $63.29 | | | $60,595.20 | $235.07 | |
| | Applied Debtor Suspense | 03/01/02 | $617.40 | | | | $63.29 | | | | ($617.40) | |
| 04/08/02 | Installment Payment | 04/01/02 | $609.36 | | $30.21 | $523.90 | $63.29 | | | $60,564.99 | ($9.04) | |
| 05/09/02 | Installment Payment | 05/01/02 | $609.36 | | $30.48 | $523.63 | $63.29 | | | $60,534.51 | ($9.04) | |
| 06/07/02 | Installment PaymentR | 06/01/02 | $609.36 | | $30.74 | $523.37 | $63.29 | | | $60,503.77 | ($9.04) | |
| 07/08/02 | Installment Payment | 07/01/02 | $608.00 | | $31.00 | $523.11 | $63.29 | | | $60,472.77 | ($9.40) | |
| 08/12/02 | Installment Payment | 08/01/02 | $608.36 | | $31.27 | $522.84 | $63.29 | | | $60,441.50 | ($9.04) | |

Table I

| Date Rcvd | Description | Installment Date | Amt Rcvd | Trustee Arrears | Principal | Interest | Escrow | Late Fees | Other | Principal Balance | Debtor Suspense | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/09/02 | Installment Payment | 09/01/02 | $608.35 | | $31.54 | $522.57 | $63.29 | | | $60,406.96 | ($9.04) | |
| 09/13/02 | Trustee Payment | | | $28.07 | | | | | | | | |
| 10/14/02 | | 10/01/02 | $608.36 | | $31.82 | $522.29 | $63.29 | | | $60,375.14 | ($9.04) | |
| 11/08/02 | | 11/01/02 | $150.00 | | | | $63.29 | $27.27 | | | $85.71 | |
| 12/09/02 | Installment Payment | 11/01/02 | $608.34 | | $32.37 | $521.74 | $63.29 | | | $60,342.77 | ($9.04) | |
| | | 12/01/02 | | | | | $63.29 | | | | | |
| 12/11/02 | Hazard Premium | | | | | | ($740.00) | | | | | |
| 12/12/02 | Trustee Payment | | | $291.86 | | | | | | | | |
| 01/10/03 | Installment Payment | 12/01/02 | $608.34 | | $32.37 | $521.74 | | | | $60,310.40 | ($9.04) | |
| | | 01/01/03 | | $71.43 | | | $71.04 | | | | ($16.81) | Table II for monthly escrow calculation |
| 01/17/03 | Trustee Payment | | | | | | | | | | | |
| 02/07/03 | Installment Payment | 01/01/03 | $608.34 | | $32.37 | $521.74 | $71.04 | | | $60,278.03 | ($16.81) | |
| 02/17/03 | Trustee Payment | 02/01/03 | | $91.80 | | | | | | | | |
| 03/10/03 | Installment Payment | 02/01/03 | $608.34 | | $32.93 | $521.18 | $71.04 | | | $60,245.10 | ($16.81) | |
| 03/25/03 | Trustee Payment | 03/01/03 | | $121.46 | | | | | | | | |
| 04/07/03 | Installment Payment | 03/01/03 | $608.34 | | $33.22 | $520.89 | $71.04 | | | $60,211.88 | ($16.81) | |
| 04/18/03 | Trustee Payment | 04/01/03 | | $121.46 | | | | | | | | |
| 05/09/03 | Installment Payment | 04/01/03 | $608.34 | | $33.50 | $520.61 | $71.04 | | | $60,178.38 | ($16.81) | |
| 05/27/03 | Trustee Payment | 05/01/03 | | $121.46 | | | | | | | | |
| 06/09/03 | Installment Payment | 05/01/03 | $608.34 | | $33.79 | $520.32 | $71.04 | | | $60,144.59 | ($16.81) | |
| 06/24/03 | Trustee Payment | 06/01/03 | | $121.46 | | | | | | | | |
| 07/15/03 | Installment Payment | 06/01/03 | $608.34 | | $34.06 | $520.03 | $71.04 | | | $60,110.53 | ($16.81) | |
| 07/23/03 | Trustee Payment | 07/01/03 | | $121.46 | | | | | | | | |
| 08/07/03 | Installment Payment | 07/01/03 | $712.59 | | $34.36 | $519.73 | $71.04 | | | $60,076.17 | $87.44 | |
| 09/08/03 | Installment Payment | 08/01/03 | $712.59 | | $34.66 | $519.43 | $71.04 | | | $60,041.51 | $87.44 | |
| 10/13/03 | Installment Payment | 09/01/03 | $712.59 | | $34.96 | $519.13 | $71.04 | | | $60,006.55 | $87.44 | |
| 11/07/03 | Installment Payment | 10/01/03 | $712.59 | | $35.26 | $518.83 | $71.04 | | | $59,971.29 | $87.44 | |
| 12/08/03 | Installment Payment | 11/01/03 | $712.58 | | $35.56 | $518.53 | $71.04 | | | $59,935.73 | $87.43 | |
| | | 12/01/03 | | | | | | | | | | |

Table I

| Date Rcvd | Description | Installment Date | Amt Rcvd | Trustee Arrears | Principal | Interest | Escrow | Late Fees | Other | Principal Balance | Debtor Suspense | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/09/04 | Installment Payment | 12/01/03 | $712.59 | | $35.87 | $578.22 | | | | $59,899.86 | | |
| | Debtor Suspense Applied | 01/01/04 | | | | | $45.21 | | | | $113.27 | |
| | | 01/01/04 | | | | | | | | | ($554.11) | |
| 01/29/04 | 02-10228 Dismissed | Totals | | $1,090.46 | $35.18 | $517.93 | $262.17 | $27.71 | $15.00 | $59,883.68 | $40.64 | |
| | Trustee Payments Applied | 08/01/01 | | ($1,090.46) | $36.49 | $517.60 | $262.17 | $27.71 | $15.00 | $59,863.68 | | $411.29 applied to poc escrow balance |
| | | | | | | | | | | $59,827.19 | | $125.06 unapplied |
| 02/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 03/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 04/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 04/20/04 | 04-12889 Bankruptcy Filed | Totals | | | | | $262.17 | $110.84 | $15.00 | $59,827.19 | $40.64 | Table IV |
| 05/01/04 | Debtor Suspense Applied | | $40.55 | | | | | | | | ($40.64) | Suspense applied to POC |
| | Unapplied Trustee Payment | | | | | | | | | | | $125.06 applied to POC |
| | POC adjustment | 1/04-3/04 | $135.63 | | | | $135.63 | | | | | added to POC |
| 05/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 06/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 07/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 08/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 09/16/04 | Late Charge | | | | | | | $27.71 | | | | |
| 09/22/04 | Adj. to Escrow for Adequate Prot 6/04 - 8/04 | | $195.63 | | | | $135.63 | | | | | added to POC |
| 10/13/04 | Installment Payment | 05/01/04 | $712.08 | | $36.18 | $517.91 | $45.21 | | | $59,791.01 | $112.76 | |
| 10/05/04 | Installment Payment | 09/01/04 | $608.00 | | $36.81 | $517.28 | $45.21 | | | $59,754.20 | $9.01 | |
| | Applied Debtor Suspense | 10/01/04 | $45.21 | | | | | | | | ($45.21) | |
| 11/09/04 | Installment Payment | 10/01/04 | $712.08 | | $37.13 | $516.96 | $45.21 | | | $59,717.07 | $112.76 | |
| 11/12/04 | Trustee Payment | 11/01/04 | | $786.54 | | | | | | | | |
| 12/08/04 | Hazard Premium | | | | | | ($651.00) | | | | | |
| 12/13/04 | Trustee Payment | | | $944.00 | | | | | | | | |
| 12/27/04 | Installment Payment | 11/01/04 | $712.08 | | $37.45 | $516.64 | $45.21 | | | $59,679.62 | $112.76 | |
| 01/07/05 | Installment Payment | 12/01/04 | $712.08 | | $37.76 | $516.32 | $54.25 | | | $59,641.86 | $103.72 | |
| 02/08/05 | Installment Payment | 01/01/05 | $712.08 | | $38.09 | $515.99 | $54.25 | | | $59,603.77 | $103.72 | |
| 03/09/05 | Installment Payment | 02/01/05 | $712.08 | | $38.42 | $515.66 | $54.25 | | | $59,565.35 | $103.72 | |
| 03/09/05 | Applied Debtor Suspense | 03/01/05 | $44.11 | | $38.75 | $515.33 | $54.25 | | | $59,526.60 | ($554.11) | |
| 04/08/05 | Installment Payment | 03/01/05 | $712.58 | | $39.08 | $515.00 | $54.25 | | | $59,487.52 | $104.22 | |
| 05/06/05 | Installment Payment | 04/04/05 | $712.58 | | $39.42 | $514.66 | $54.25 | | | $59,448.10 | $104.22 | |
| 07/08/05 | Installment Payment | 07/01/05 | $712.59 | | $40.12 | $513.99 | $54.25 | | | $59,368.22 | $104.23 | |

Table I

| Date Rcvd | Description | Installment Date | Amt Rcvd | Trustee Arrears | Principal | Interest | Escrow | Late Fees | Other | Principal Balance | Debtor Suspense | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/26/05 | 04-12889 Dismissed | Totals | | $3,120.00 | $205.83 | $2,564.72 | $488.13 | $277.10 | $15.00 | $59,368.22 | $483.73 | Table V |
| | Application of Trustee Payments | 9/01/01-01/01/02 | $3,120.00 | ($3,120.00) | | | | | | | | $271.26 applied to escrow poc balance |
| | | | | | | | | | | | | $78.19 + $125.06 = $203.25 unapplied |
| | Applied Debtor Suspense | 02/01/04 | $554.11 | | $42.24 | $511.87 | | | | | ($483.73) | $483.73 + 40.64 from debtor suspense; and |
| | Application of POC credits | | | | | | | | | | | $29.74 from Trustee unapplied; |
| 08/29/05 | Hurricane Katrina Landfall | | | | | | | | | | $173.51 | Remaining balance of Trustee unapplied 173.51 |
| 12/01/05 | Interest Rate Change | Interest = 10.75%; P&I = $559.66 | | | | | | | | | | |
| 12/07/05 | Hazard Premium | | | | | | ($651.00) | | | | | |
| | Unapplied Trustee payments | | | | | | $173.51 | | | | | |
| 12/01/06 | Interest Rate Change | Interest = 12.00%; P&I = $621.54 | | | | | | | | | | |
| 03/20/07 | Hazard Premium | | | | | | ($687.23) | | | | | |
| 06/12/07 | 07-11113 Bankruptcy Filed | Totals | | | | | ($676.49) | $277.10 | $15.00 | | | Table VI |

Table II

| Description | Balance | | Comments |
|---|---|---|---|
| 7/03 Payment | $71.04 | | |
| 8/03 Payment | $71.04 | | |
| 9/03 Payment | $71.04 | | |
| 10/03 Payment | $71.04 | | |
| 11/03 Payment | $71.04 | | |
| 12/03 Payment | $71.04 | | |
| 12/10/03 Hazard Premium | ($651.00) | | |
| Balance 12/31/03 | | $216.96 | 2004 Mo. Escrow Calculation: 216.96-(651 + 108.50) = 542.54 / 12 = 45.21 |
| 1/04 Payment | $45.21 | | |
| 04-12889 Bankruptcy filed | | $262.17 | |
| 2/04 - 4/04 | $135.63 | | 3 (2/04 - 4/04)@ $45.21 = 135.63 Per 2004 Proof of Claim |
| 5/04 Payment | $45.21 | | |
| 6/04 - 8/04 | $135.63 | | 3 (6/04 - 8/04)@ $45.21 = 135.63 Per 2004 Adequate Protection Order |
| 9/04 Payment | $45.21 | | |
| 10/04 Payment | $45.21 | | |
| 11/04 Payment | $45.21 | | |
| 12/04 Payment | $45.21 | | |
| 12/08/04 Hazard Premium | ($651.00) | | |
| Balance 12/31/04 | | $108.48 | 2005 Mo. Escrow Calculation: 108.48- (651 + 108.50) = 651.02 / 12 = 54.25 |
| 1/05 Payment | $54.25 | | |
| 2/05 Payment | $54.25 | | |
| 3/05 Payment | $54.25 | | |
| 4/05 Payment | $54.25 | | |
| 5/05 Payment | $54.25 | | |
| 7/05 Payment | $54.25 | | |
| Balance 7/31/05 | | $488.23 | |
| 12/05 Hazard Premium | ($651.00) | | |
| Application of Debtor Suspense | $173.52 | | |
| 3/07 Hazard Premium | ($687.23) | | |
| Balance 3/31/07 | | ($676.48) | |
| 07-11113 Bankruptcy filed | | | POC calculation: 2007 Mo Escrow Calculation--687.23 + 114.54 = 801.18 / 12 = 66.81 |
| | | | 676.48 + ( 1/07-6/07 @ 66.81) = 1077.34 |
| POC Adjustment 1/07-6/07 | $400.86 | | |
| POC Adjustment | $676.48 | $400.86 | |

Table II

| Description | Balance | Comments |
|---|---|---|
| 1/00 - 3/01 | $0.00 | |
| 3/12/01 Hazard Premium | ($651.00) | |
| 5/01 Debtor Suspense Payment | $399.89 | |
| 6/01 Payment | $84.22 | Initial Escrow Calculation (($651 + $651 + $108.50)-$399.89) / 12 = $84.22 |
| 7/01 Payment | $84.22 | |
| 8/01 Payment | $84.22 | |
| 9/01 Payment | $84.22 | |
| 10/01 Payment | $84.22 | |
| 11/01 Payment | $84.22 | |
| 12/12/01 Hazard Premium | ($651.00) | |
| Balance 12/31/01 | ($396.79) | |
| 02-10228 Bankruptcy filed | | |
| Application of Debtor Suspense | $48.79 | |
| POC Balance Adjustment | $348.00 | $0.00 POC Escrow Calculation $396.79 + $63.29 = $460.08 |
| POC 1/02 payment adjustment | $63.29 | $63.29 2002 Mo Escrow Calculation: 651 + 108.50 = 759.50 / 12 = 63.29 |
| 2/02 Payment | $63.29 | |
| 3/02 Payment | $63.29 | |
| 4/02 Payment | $63.29 | |
| 5/02 Payment | $63.29 | |
| 6/02 Payment | $63.29 | |
| 7/02 Payment | $63.29 | |
| 8/02 Payment | $63.29 | |
| 9/02 Payment | $63.29 | |
| 10/02 Payment | $63.29 | |
| 11/02 Payment | $63.29 | |
| 12/02 Payment | $63.29 | |
| 12/11/02 Hazard Premium | ($744.00) | |
| Balance 12/31/02 | $15.48 | 2003 Mo. Escrow Calculation $15.48 - ($744 + 124) = $852.52/12 = $71.04 |
| 1/03 Payment | $71.04 | |
| 2/03 Payment | $71.04 | |
| 3/03 Payment | $71.04 | |
| 4/03 Payment | $71.04 | |
| 5/03 Payment | $71.04 | |
| 6/03 Payment | $71.04 | |

Table III
2002 Proof of Claim Reconciliation

| | |
|---|---|
| 6 Payments @ $554.11 | $3,324.66 |
| Accrued Late Charges | 27.71 |
| Foreclosure Fees and Costs | 1,968.33 |
| Inspection Fee | 15.00 |
| Suspense Balance | (48.79) |
| Escrow Balance | 396.79 |

| | |
|---|---:|
| Escrow Payment 1/1/02 | 63.29 |
| BPO | 50.00 |
| Total | $5,796.99 |

\* \* \*

### Past Due Balance Due at Dismissal of 2002 Bankruptcy

| | | |
|---|---:|---:|
| **Past Due Payments** | | |
| 8/1/01 1/1/02 @ $554.11 | $3,324.66 | |
| Less Trustee Payment (8/1/01 installment) | (554.11) | |
| 5 Past Due 9/1/01–1/1/02 | | $2,770.55 |
| | | |
| **Past Due Escrow** | | |
| Negative Balance on Filing | 396.79 | |
| Add Escrow Charge 1/1/02 | 63.29 | |
| Less Debtor Suspense Account on Filing | (48.79) | |
| | 411.29 | |
| Less Trustee Payment | (411.29) | |
| | | 0.00 |
| | | |
| Accrued Late Charges (2) | 55.42 | |
| Inspection Fee | 15.00 | |
| Attorneys' Fees and Costs | 1,968.33 | |
| BPO | 50.00 | |
| Total Costs and Fees | | 2,061.04 |
| Subtotal | | $4,831.59 |
| Less Unapplied Trustee Payment | | (125.06) |
| | | $4,734.24 |

### Table IV
### 2004 Proof of Claim Reconciliation

| | | |
|---|---:|---:|
| Balance Due at Dismissal of 2002 Case | $4,734.24 | |
| Additional Past Due Payments | | |
| 3 (2/1/04–4/1/04) @ $554.11 | 1,662.33 | |
| Additional Past Due Escrow Payments | | |
| 3 (2/1/04–4/1/04) @ $45.21 | 135.63 | |
| Additional Late Charges | | |
| 3 (2/1/04–4/1/04) @ $27.71 | 83.13 | |
| Additional BPO | 50.00 | |
| Additional Attorneys' Fees and Costs | 1,528.61 | |
| Less Debtor Suspense Balance (4/1/04) | (40.64) | |
| | | $ 8,153.30 |
| | | |
| **Plus Consent Order:** | | |
| Attorneys' Fees and Costs | 500.00 | |
| Postpetition Past Due Payments | | |
| 3 (6/04–8/04) @ $554.11 | 1,662.33 | |
| Late Charges | | |
| 5 (5/04–9/04) @ $27.71 | 138.55 | |
| Postpetition Past Due Escrow Payments | | |
| 3 (6/04–8/04) @ $45.21 | 135.63 | |
| | | $ 2,436.51 |
| | | |
| Total | | $10,589.81 |

### Table V
### Past Due Balance July 2005

Previous Past Due Installments
| | | |
|---|---|---|
| 5 (9/1/01–1/1/02) @ $554.11 | $2,770.55 | |
| Less 2004 Trustee Payments | (2,770.55) | |
| 3 (2/1/04–4/1/04) @ $554.11 | 1,662.33 | |
| 3 (6/1/04–8/1/04) @ $554.11 | 1,662.33 | |
| | | $3,324.66 |

Additional Credits
| | | |
|---|---|---|
| Debtor Suspense Balance 4/04 | 40.64 | |
| Debtor Suspense Balance 7/05 | 483.73 | |
| Unapplied Trustee Payments [1] | 203.25 | |
| (2002 of $125.06 plus 2004 | 727.62 | |
| ($3,120.00 − $2,770.55 − $78.19)) | | |

| | | |
|---|---|---|
| Pay 2/1/04 Installment | | ($554.11) |
| Less Unapplied Funds | | ($173.51) |
| | | $2,597.04 |

Past Due Escrow
| | | |
|---|---|---|
| 3(2/1/04–4/1/04) @ $45.21 | 135.63 | |
| 3(6/1/04–8/1/04) @ $45.21 | 135.63 | |
| Less 2004 Trustee Payments | (271.26) | |
| | | $0.00 |

| | | |
|---|---|---|
| Late Charges (10) | | |
| 12/00, 11/02, 2/04–9/04 | 277.10 | |
| Inspection Fees | 15.00 | |
| BPOs (2) | 100.00 | |
| Attorney's Fees and Costs | 3,996.94 | |
| | | $4,389.04 |

| | |
|---|---|
| Total | $6,986.08 |

### Table VI
### Past Due Balance June 12, 2007

Past Due installments
| | | |
|---|---|---|
| 5 (3/04–4/04; 6/04–8/04) @ $554.11 | $2,770.55 | |
| 4 (8/05–11/05) @ $554.11 | 2,216.44 | |
| 12 (12/05–11/06) @ $569.66 | 6,835.92 | |
| 7 (12/06–6/07) @ $621.54 | 4,350.78 | |
| Negative Escrow (balance 12/31/06) | (676.49) | |
| Escrow 6 (1/1/07–6/1/07) @ $66.81 | 400.86 | |
| Attorneys' Fees and Costs | 7,280.96 | |
| Late Charges (10) | 277.10 | |
| Inspection Fee | 15.00 | |
| BPO (2) | 100.00 | |
| Total | | $24,924.10 |

1. Unapplied funds from 2002 Bankruptcy of $125.06 plus unapplied funds from 2004 bankruptcy (($3,120.00 − $2,770.55 − $274.26) = $78.19).